174 So.2d 651 (1965)
Ralph B. LEE et al., Plaintiffs-Appellants,
v.
L. T. GOODWIN, Defendant-Appellee.
No. 10346.
Court of Appeal of Louisiana, Second Circuit.
March 17, 1965.
Rehearing Denied and Supplemental Opinion Filed April 28, 1965.
Phillips, Risinger & Kennedy, Shreveport, for plaintiffs-appellants.
*652 Ford E. Stinson, Benton, for defendant-appellee.
Before HARDY, GLADNEY, and AYRES, JJ.
AYRES, Judge.
This is an action for a declaratory judgment wherein plaintiffs, under mesne conveyances from one S. A. Cochran, seek to have recognized as valid and subsisting a royalty interest in the oil, gas, and other minerals produced from a described 60-acre tract of land situated in Bossier Parish, Louisiana, as granted by defendant Goodwin to Cochran by an instrument dated March 2, 1945.
The defendant contends that the royalty interest has prescribed under the 10-year prescription liberandi causa. This defense is predicated upon the propositions (1) that no exploration for gas, oil, or other minerals has been undertaken on the property concerned and (2) that no production was had from a well in a unit with which the property was pooled or unitized within a period of 10 years from the creation of the royalty interest. Defendant's plea of prescription, after trial of the merits of the case, was sustained and, accordingly, plaintiffs' demands were rejected and they have appealed.
The royalty deed in dispute conveyed a 1/16 of the whole of the oil, gas, or other minerals, except sulphur, on and under, and to be produced from, the SW¼ of the SW¼ and the S½ of the NW¼ of the SW¼, Sec. 29, T. 23 N., R. 12 W., and, as to sulphur, 25¢ per long ton, subject, but not limited, to a lease then affecting the land. The instrument provided:
"* * * This sale and transfer, however, is not limited to royalties accruing under the lease presently affecting said lands but the rights herein granted are and shall remain a charge and burden on the land herein described and binding on any future owners or lessees of said lands and, in the event of the termination of the present lease, the said royalties shall be delivered and/or paid out of the whole of any oil, gas or other minerals produced from said land by the owner, lessee or anyone else operating thereon.
"The grantor herein reserves the right to grant future leases affecting said lands so long as there shall be included therein, for the benefit of the grantee herein, the royalty rights herein conveyed; and the grantor further reserves the right to collect and retain all bonuses and rentals paid for or in connection with any future lease or accruing under the lease now outstanding."
A brief review of the essential facts is deemed expedient to an understanding and resolution of the issues presented. No well in search of oil, gas, or other minerals was drilled on subject property. However, the lessee, Continental Oil Company, in June, 1952, completed a well denominated Goodwin 1-A on the SW¼ of the NW¼, Sec. 29, T. 23 N., R. 12 W. This well was subsequently, in August, 1953, conveyed to one R. W. Fair, at whose instance the Department of Conservation, by order of the Commissioner dated September 1, 1954, unitized the west half of the aforesaid section for the exploration and production of gas and condensate from the Goodwin Sand of the Hosston Formation of the Redland Field in which the described lands were located.
The Goodwin Well was approved as to location and was designated the unit well. Drilled through the Pettit and the Hosston or Travis Peak formations, the well was perforated in both formations at the respective depths of approximately 6300 and 7300 feet. Under a test of July 14, 1952, it was determined that the well was capable of producing, from the Hosston or Travis Peak Formation, 1,338,000 cubic feet of gas per day and condensate at the rate of 28 barrels per million cubic feet of gas. Completion of the well as a dual producer was *653 unauthorized. Consequently, the lessee, Continental Oil Company, placed a packer between the producing horizons and produced crude oil from the Pettit Formation as a pumper. Production of gas from the Hosston or Travis Peak Formation was thus shut off and delayed because of the lack of a market and pipeline facilities.
In the chronology of events, we may now observe that the Continental Oil Company, joined by Fair, under date of September 22, 1954, surrendered its lease covering the 60-acre tract herein involved. Fair, however, under date of April 27, 1955, acquired a new 1-year lease on this tract, to remain in force "as long thereafter as oil, gas or other minerals is produced from said land or land with which said land is pooled hereunder."
The Goodwin Well was only one of several acquired by Fair from Continental Oil Company. Production from these wells was insufficient to create a demand therefor or to warrant or justify the construction of a pipeline to a possible market. In order to increase production to justify the construction of a pipeline and incidental facilities, and to create a market therefor where none was then available, Fair drilled five other wells. Production was accordingly increased to an extent thought to warrant the construction of a pipeline. Therefore, a pipeline 9½ miles in length was constructed at a cost of $125,000.00.
The sale of production from the Goodwin Well was begun in November, 1955, and continued until about 1960, when the well ceased to produce. Production for the period from November, 1955, to June, 1956, amounted to 197,889,000 cubic feet of gas and condensate produced at the rate of 28 barrels per million cubic feet of gas, the proceeds of the sale of which aggregated $33,631.13. Although production was never sufficient to pay the construction cost of the pipeline by which the gas was delivered to market, the well was a producer of gas in paying quantities.
For a well to be a producer in paying quantities, it is not necessary that the operator recover the cost of his development; it is only necessary that he recover the cost of his production with a profit. Thus, it was stated in Knight v. Blackwell Oil & Gas Co., 197 La. 237, 1 So.2d 89, 91 (1941):
"The words `in paying quantities' can mean the production of oil or gas in such a quantity as will pay a small profit over operation costs of the well, although the expense of drilling and equipping the well may never be paid, and thus, the operation as a whole might result in a loss to the lessee. Under such circumstances, the well might be operated by the lessee, in order to recoup some of the drilling and equipment costs."
The fact that the well already in existence had been tested by the Department of Conservation, found productive, and was then designated by the Commissioner as the well for the unit is a clear indication that it was a commercial producer.
Defendant's final contention concerns the effect upon a royalty interest of the nonproduction within a 10-year period following the acquisition of the royalty interest, from a unit well capable of producing in paying quantities but shut in for want of a market. In LeBlanc v. Haynesville Mercantile Company, Inc., 230 La. 299, 88 So.2d 377, 380 (1956), it was held that, where a well was capable of producing gas and gas condensate in paying quantities and was located on land included within a unit which was formed within 10 years from the date of the royalty sale, the royalty interest did not prescribe, and the fact that the well was shut in for want of a market and that no gas was sold from it until after the expiration of 10 years from the date of the royalty sale could not defeat the rights of the grantee of the royalty interest to share in the production, once begun. See, also, Sohio Petroleum Co. v. V. S. & P. R. R., 222 La. 383, 62 So.2d 615 (1952); Union Oil Company of California *654 v. Touchet, 229 La. 316, 86 So.2d 50 (1956). A comparable factual situation is presented in the instant case and the same rule governs.
Defendant apparently further contends that because of the nonpayment of shut-in royalties there was no interruption of prescription by usage of the royalty right for a period of 10 years. This position is untenable for several reasons. The first is as was stated in LeBlanc v. Haynesville Mercantile Company, Inc., supra (230 La. 299, 88 So.2d 377, 380), and to which we have already referred:
"The fact that the well [on land included within the unit of which subject property formed a part] was shut in for want of a market and that no gas was sold from it until after the expiration of ten years from the date of the royalty sale cannot defeat the rights of the defendant to share in the production, once begun."
Other reasons are that the rights of plaintiffs as royalty owners were specifically limited by the terms of the royalty deed to a participation in the oil, gas, or other minerals actually produced.
Moreover, shut-in royalties were not payable to anyone, not even to defendant, the landowner. As heretofore pointed out, the lease originally granted by the landowner upon subject property was voluntarily released and canceled. The subsequent lease was for a primary period of one year and the consideration therefor was fully paid. Actual production was begun well within the primary term.
For the aforesaid reasons, we conclude that the plea of 10-year prescription liberandi causa is without merit and was improperly sustained.
Accordingly, the judgment appealed is annulled, avoided, reversed, and set aside; and
It is now ordered, adjudged, and decreed that defendant's plea of 10 years' prescription liberandi causa be, and the same is hereby, overruled and there be judgment herein in plaintiffs' favor against the defendant, L. T. Goodwin, and that, accordingly, the royalty sale from L. T. Goodwin to S. A. Cochran, covering a 1/16 of the whole of any oil, gas, or other minerals, except sulphur, owned and under, and to be produced from, the following-described property, to wit:
SW¼ of SW¼ and S½ of NW¼ of SW¼, Sec. 29, T. 23 N., R. 12 W., Louisiana meridian, Bossier Parish, Louisiana,
and, as to sulphur, 25¢ per long ton for all sulphur produced from said lands, as per instrument dated March 2, 1945, and recorded in Book 170, page 251, of the Conveyance Records of Bossier Parish, Louisiana, be, and the same is hereby, recognized and decreed to be in full force and effect; and,
Further, that plaintiffs be, and are hereby, recognized and decreed to be the owners of and entitled to the proceeds of the sale of all gas and condensate produced to the credit of their interest in the proportions as follows:

Eleanor Wilson......17/2880
Frank C. Adams......18/2880
C. B. Faulkner......51/2880 less
 1/4 thereof
Ralph B. Lee .. 1/4 of 51/2880
W. E. West.............60/2880
The Citizens National
 Bank of Tyler, Tyler,
 Texas, testamentary
 executor of the estate
 of R. K. Wilson,
 Jr., deceased.........34/2880,

from the date that production from the aforesaid Goodwin 1-A Well was begun.
It is further ordered, adjudged, and decreed that defendant-appellee pay all costs, including the cost of this appeal.
Reversed and rendered.

*655 SUPPLEMENTAL OPINION.
PER CURIAM:
We do not intend that the language used in our original opinion relating to the facts of the instant case be construed as holding that a royalty interest is dependent upon production in paying quantities. The inherent nature of a royalty interest is that of a right to share in any production, and it follows that production, regardless of whether it be in paying quantities or not, constitutes an interruption of prescription as against a royalty interest. Although our Supreme Court has not enunciated a definitive pronouncement on this point, it has several times characterized a royalty right as an entitlement to share in production. For example, in Mays v. Hansbro, 222 La. 957, 64 So.2d 232, the court, in considering the question of interruption of a right of servitude, declared:
"It is unimportant whether this production was in paying quantities so long as there was some production or use of the servitude."
In Union Sulphur Co. v. Lognion, 212 La. 632, 33 So.2d 178, although holding that mere commencement of operations is insufficient to interrupt prescription with respect to a royalty interest, the opinion declared:
"* * * the date of the original royalty deed and that of production were the determining factors respecting the issue of [the] prescriptibility * * *."
The opinion in Union Sulphur Co. v. Andrau, 217 La. 662, 47 So.2d 38, used the following language:
"* * * since the sale or reservation of a royalty * * * is the mere sale or reservation of a right to share in the production of minerals if and when produced * * *."
We think it reasonable to conclude that the consistent reference to a royalty right as a right to share in production, which is so clearly indicated by the language noted in the above opinions, excludes any requirement that the production be established as profitable to the operator.