201 So.2d 280 (1967)
PAN AMERICAN PETROLEUM CORPORATION et al., Plaintiffs-Appellees,
v.
Tilon M. O'BIER et al., Defendants-Appellants.
No. 10829.
Court of Appeal of Louisiana, Second Circuit.
June 30, 1967.
Rehearing Denied July 27, 1967.
*281 Campbell, Campbell & Marvin, Minden, for defendants-appellees, Group A defendants.
Riley B. Fell, Tulsa, Okl., for defendant, Marathon Oil Co.
Paul A. Newell, Haynesville, for defendants-appellants, Haynesville Mercantile Co., C. E. Miller, Claude Beene, Heirs of Mrs. Jodie Lewis.
Lowe & Benton, Minden, curator ad hoc representing W. L. Wright and Frances McInnis Crumpton, for appellees.
Stewart & Stewart, Minden, for John E. Ashby and Frank C. Ashby.
Simon, Carroll, Fitzgerald & Fraser, Shreveport, for plaintiffs-appellees.
Before HARDY, GLADNEY and AYRES, JJ.
HARDY, Judge.
This is a concursus proceeding seeking judicial distribution between opposing claimants of funds from oil and gas production attributable to tracts of land in Webster Parish included in production units established by the Department of Conservation with particular reference to *282 the present production of oil from what is known as the Mitchell Unit Well.
Petitioners, operators of the Mitchell Well, named as defendants two groups of opposed claimants to mineral rights in the described property. The Group A defendants, Theron J., Tilon M. O'Bier and Vertie M. O'Bier Miller, are owners of the fee title to the property and claim ownership of all the minerals therein. The Group B defendants, J. F. O'Bier, the eight heirs of Jettie O'Bier Lewis, Claude Beene, C. E. Miller, W. L. Wright, Frances McInnis Crumpton, F. C. and John Ashby, Haynesville Mercantile Company and Marathon Oil Company, were alleged to be claimants of fractional interests deriving from sales or reservations of mineral rights.
From judgment recognizing the Group A defendants as owners of all minerals, some, though not all, of the Group B defendants have appealed. Specifically the appellants before the Court are Haynesville Mercantile Company, C. E. Miller, Claude Beene, and the eight heirs of Lewis.
Although plaintiffs instituted this suit for the purpose of fixing the distribution of funds attributable to a 20 acre tract of land described as the E½ of NW ¼ of SE ¼ of Section 31, Township 23 N., Range 9 W., Webster Parish, Louisiana, the suit involves, and the judgment decrees the ownership of the minerals in tracts of land aggregating 160 acres and particularly described as:
Northeast ¼ of Northwest ¼, Southeast ¼ of Northwest ¼, less 20 acres in a square in the Southwest corner, West ½ of Northeast ¼ and East ½ of Northwest ¼ of Southeast ¼ of Section 31, Township 23 North, Range 9 West, Webster Parish, Louisiana.
The essential facts, undisputed by the parties, may be briefly narrated. In 1919 H. B. O'Bier executed an oil and gas lease covering the tract of 160 acres in Section 31, of which he was the sole owner, which lease was acquired by the Texas Company through assignment. Subsequent to the execution of the lease O'Bier made several sales of mineral interests in various portions of the 160 acre tract. In September, 1923, the Texas Company completed a gas well located in the Northeast Quarter of the Northwest Quarter of Section 31, producing approximately fifty million cubic feet of gas per day. This well is the only operation or production that has ever been undertaken on any part of the 160 acre tract of land.
In December, 1923, the Texas Company and all of the then mineral owners executed an amendment to the original lease with reference to the gas royalty provision which, insofar as pertinent to this litigation, reads as follows:
"2nd. To pay the lessors at the rate of Two Hundred ($200.00) Dollars per annum, payable quarterly, for each well producing gas in paying quantities, but not producing oil in paying quantities, and from which gas is not being used, or sold, off the land, but when and while such gas is being used, or sold, off the land by lessee, the same shall be metered and lessors shall be paid one-eighth (1/8th) of two cents (2¢) per thousand (1,000) cubic feet, corrected to two (2) pounds above atmospheric pressure, for the gas so used or sold off the land, and lessors shall have the privilege, at lessors' risk and expense of making connections and using gas from such wells free of charge for one dwelling on the land, such connection, where meter is installed, shall be between the wells and the meter; * * *."
(Emphasis supplied)
Prior to 1930 H. B. O'Bier and his wife, Sarah, died intestate leaving as their heirs seven children and four children of a predeceased *283 daughter who inherited the fee title to the property together with the unsold mineral interests in various portions of the 160 acres of land.
There were numerous sales involving the fee title as well as sales and reservations of fractional interests in the minerals of various tracts of land prior to the year 1936, by which time P. E. O'Bier had acquired the fee title to the entire 160 acres of land which was inherited by the Group A defendants, as owners, on the death of P. E. O'Bier in 1955.
Production of gas from the Texas Company well continued in decreasing amounts from the time of its completion in 1923 until August of 1939 when the pipeline connections with the well were removed and the well was capped. After August of 1939 no gas was sold from the well off the premises, but from September 1, 1939, to September 1, 1957, the Texas Company paid, or offered to pay, a shut-in royalty of $200.00 per annum to the various mineral owners. After 1948 P. E. O'Bier refused to accept payment of this shut-in royalty, although he continued to use gas for the service of his residence located on the leased tract up until the time of his death in 1955.
By instrument dated March 19, 1932, executed by the Texas Company and the mineral owners, the said company released all leasehold rights in and to all of the property included in the original lease of September 4, 1919, with the exception of the 40 acre tract of land (NE ¼ of NW ¼ of Section 31) upon which the Texas Company gas well was located, from which gas was then being sold off the premises. The Texas Company formally surrendered and cancelled all rights with respect to its lease on this 40 acre tract in 1957.
In the years from 1947 to 1949, through assignment of leases and co-lessor agreements, petitioners in this action became the owners of the mineral leasehold rights on all of the land except the 40 acre tract covered by the Texas Company lease.
Although there have been no drilling operations on any of the lands involved, with the exception of the Texas Company well of 1923, operations resulting in production have been conducted on adjacent lands with which portions of the subject property were unitized. In 1950 a well known as the Mitchell Well was completed as a gas producer on the NE ¼ of SE ¼ of Section 31, which was subsequently unitized by order of the Department of Conservation with portions of the subject lands and was known as the Mitchell Gas Unit. In 1951 a well was drilled and completed as a gas producer located in the NW ¼ of SW ¼ of Section 31, which property was unitized by order of the Department of Conservation with a portion of the subject land, which well was known as the O'Bier Gas Unit.
Both of the above unit wells ceased production, but the Mitchell Well was reworked and, after completion as an oil producer, was placed under an 80 acre production unit established by the Department of Conservation, which unit includes the 20 acre tract of the subject lands described as the E ½ of NW ¼ of SE ¼ of Section 31.
Small portions of the total amounts deposited in the registry of the court by petitioners in this action were derived from the operations of the Mitchell Gas Unit and the O'Bier Gas Unit, but by far the most substantial portion of the funds has been derived from the operation of the Mitchell Unit for the production of oil, which production was continuing as of the time of filing of this suit in 1962.
The issues presented on this appeal are delineated by the opposed contentions of the claimants.
The Group A defendants claim ownership of the entire mineral interest in 160 acres *284 involved by reason of the asserted expiration of the outstanding mineral servitudes through non-user over a period of more than ten years. The factual basis for this claim rests upon the contention that there were no operations on any part of the 160 acres nor on any lands with which any portion thereof was unitized during the period extending from August, 1939, the date of the alleged termination of production and abandonment of the Texas Company O'Bier Well, until the drilling of the Mitchell Well in 1950.
The Group B defendants-appellants first contend that their interests in the minerals have been preserved as against the plea of prescription by the production, delivery and use of gas from the Texas Company well for the service of a dwelling on the land on which the well was located over a continuing period of time extending from a date prior to 1936 to the year 1955, which period began with the acquisition of the fee title to the 160 acres by P. E. O'Bier in or before 1936, and terminated with his death in 1955.
The second issue urged by the Group B defendants is that prescription was suspended by the effect of the payments of shut-in royalties made by the Texas Company from 1939 through 1948.
Alternatively, the Group A defendants contend that the lack of uniformity as to the mineral interests conveyed or reserved and the non-contiguity of the tracts to which like interests were applicable have effected the division of the mineral interests into separate and distinct servitudes with the result that the use of one would not prevent the termination of the others which were not used.
We first undertake consideration of what was asserted by counsel in oral argument as the principal contention of the Group B defendants-appellants, namely, that the "use of production" from a shut-in well constituted a use of the servitude which prevented the beginning of the running of the prescriptive period. In other words, it is argued that the use of gas from the Texas Company-O'Bier well for household purposes was a continuing use of the mineral servitude which was only terminated by the death of P. E. O'Bier in 1955. The effect of the acceptance of this position would require a holding that prescription did not begin to run until 1955, well after the drilling of a well on unitized land in 1950.
In support of this argument appellants mainly rely upon the provisions of Articles 793 and 794 of the Revised Civil Code.
We think it is clear from the wording of these articles that the use contemplated therein must be accompanied by the intent to relate the act to the exercise of the servitude. This conclusion is reinforced by the plain words of Article 794 which require that the servitude be used "as appertaining to the estate."
Under the facts of the instant case we cannot justify the relation of the use of gas for incidental purposes to the use of the mineral servitude. The right of this use for household convenience was granted by the lessee and was specifically designated under the lease amendment quoted supra as a "privilege". This privilege was specifically limited and circumscribed by the further provisions that the use be undertaken at the risk and expense of the lessors and restricted to the service of "one dwelling on the land".
Inherent in our jurisprudence bearing upon the interpretation of mineral servitude doctrines with reference to public policy is the requirement that the use of the servitude be exercised by or on behalf or in the interest of the owner of such rights.
*285 The question presented is identical with that stated in Mays v. Hansbro, 222 La. 557, 64 So.2d 232, namely:
"* * * whether or not the production of gas from the land * * * interrupted * * * prescription."
To hold that the use of a small amount of gas for the service of one dwelling constituted production from a well which had been capped and from which all pipeline connections had been removed, would require such a strained and unreasonable interpretation as would not only violate the rules of reason and common sense but also the intent and purpose of considerations of public policy.
We are confirmed as to our conclusion rejecting this contention by the following pronouncement in the opinion of Mr. Justice Hawthorne in Union Oil Company of California v. Touchet, 229 La. 316, 86 So.2d 50:
"* * * it is a firmly entrenched principle of Louisiana mineral law that no act on the part of a landowner will have the effect of extending the life of a mineral interest unless it is shown that there was a clear intention on the part of the landowner to achieve that very result."
The Group B defendants-appellants next contend that payment and acceptance of shut-in royalties on a gas well interrupts the running of prescription against existing mineral servitudes, citing as authority Continental Oil Co. v. Landry, et al., 215 La. 518, 41 So.2d 73; LeBlanc, et al. v. Haynesville Mercantile Company, Inc., 230 La. 299, 88 So.2d 377, and Lee v. Goodwin (La.App. 2nd Cir., 1965), 174 So.2d 651.
We do not consider the above authorities appropriate to the proposition urged nor applicable under the facts of the instant case. The cases cited involved royalty rights, passive in nature, dependent upon production as the result of the exercise of the right to search and explore belonging to the owner of the servitude.
Under the facts of the case before us, we are not confronted with the effect of the payment of royalties with respect to a well which was shut in for lack of a market. The record is devoid of any proof of lack of a market and, to the contrary, it is clear that it was shut in and, in effect, abandoned because of failure of production.
We are not aware of any authority to the effect that the payment of a shut-in royalty, of and by itself, constitutes the exercise of the right conferred upon the holder of a mineral servitude. The determinant factor appears to relate to the cause which influences the shutting in of the well. If the cause is attributable to circumstances beyond the control of the owner of the servitude, for example, the want of a market, or the lack of pipeline transportation facilities, our courts have held that the running of prescription is suspended, although the period of time during which such a cause would be considered as justifying this conclusion has not been determined, possibly because no fixed rule in this respect would be available. (Cf. LeBlanc v. Haynesville and Lee v. Goodwin, supra)
The facts established in this case show that the production of the Texas Company O'Bier well, completed with an initial production of approximately fifty million cubic feet of gas per day, had declined to a point where the total annual production for the years 1933 to 1939, inclusive, varied from a low of approximately twenty-five million cubic feet to a high of approximately fifty-eight million cubic feet, which production represented annual gross royalty values ranging from approximately $63.00 to approximately $145.00. Under our jurisprudence involving comparable facts with respect to production, there can be no question as to the conclusion that on and for several years prior to *286 September 1, 1939, the well was not susceptible of production in paying quantities. For purposes of such comparison we mention Caldwell v. Alton Oil Company, 161 La. 139, 108 So. 314; Logan v. Tholl Oil Company, 189 La. 645, 180 So. 473, and Taylor v. Kimbell, 219 La. 731, 54 So.2d 1. However, we are not restricted to the effect of production in paying quantities for the fact is that there was no production subsequent to September 1, 1939. In order to give effect to the payment of shut-in royalties following this date as constituting a continuing use of the servitude which would prevent, interrupt or suspend the running of prescription, it would be necessary to hold that the payment of such royalties represented an acceptable substitute for development or production.
Under the facts, therefore, we cannot accept the validity of the contention that the payment of a shut-in royalty constituted such a use of the servitude rights as would prohibit the application of the principle of prescription.
Inasmuch as our conclusions above expressed dispose of the rights of the parties, we find it unnecessary to consider the alternative contention of the Group A defendants with respect to the asserted division of the servitudes involved.
For the reasons assigned the judgment appealed from is affirmed and it is ordered, adjudged and decreed that Theron J. O'Bier, Tilon M. O'Bier and Vertie M. O'Bier Miller be and they are hereby recognized as the owners of all of the mineral rights in and on the lands described as being:
NE ¼ of NW ¼, SE ¼ of NW ¼, less 20 acres in a square in Southwest corner; W ½ of NE ¼ and E ½ of NW ¼ of SE ¼, of Section 31, Township 23 North, Range 9 West, Webster Parish, Louisiana.
Costs of this appeal are taxed against appellants.