DIXON, Judge.
Plaintiffs in this case allege that they are the owners of all the minerals under a tract of land in Sections 31 and 32, Township 13 North, Range 10 West in Red River Parish, Louisiana, and pray for a judgment recognizing their ownership and ordering an accounting and a return of monies received by the defendants under certain mineral leases and oil and gas operations. The defendants, alleged to be the owners of the surface of the lands involved, filed peremptory exceptions which outlined their position: that plaintiffs’ mineral ownership had prescribed and the acts which the plaintiffs contend have interrupted prescription liberandi causa did not, in fact, do so. The judgment signed sustained “the exception of no cause of action” filed by the defendants and dismissed the plaintiffs’ suit.
Plaintiffs are the heirs of Raymond and Ross B. Nelson, Sr. who once owned all the minerals under the land involved. There were mineral reservations prior to 1920 and continuous production of hydrocarbons until the year 1943. Thereafter a dry hole was abandoned on January 2, 1952; since then the plaintiffs have taken no steps toward good faith exploration or production of minerals. The defendants executed leases covering the properties involved on December 18, 1957. Two wells were drilled under these “top-leases.” One well was commenced May 1, 1959, produced 1181 barrels of oil and was plugged and abandoned on May 12, 1964. The other well was completed as a dry hole on August 22, 1959. The exploration was done by the assignees of leases executed by defendants and their mother to H. M. Doss.
Plaintiffs had nothing to do with the execution of the leases, but attempt in their pleadings to “ratify” the leases and adopt them as their own. This suit was filed October 16, 1967. Since ten years had not elapsed between the last good faith effort to produce by a lessee of the plaintiffs (January 2, 1952) the plaintiffs contend that the exploration and production beginning in May of 1959 and ending in May of 1964 was user of the mineral servitude and interrupted prescription, preserving the plaintiffs’ rights to the minerals.
Defendants maintain that the exploration performed under a lease from the landowner could not avail the plaintiffs; that in order to interrupt prescription, the exercise of the servitude must have been by the owner of the servitude or someone acting for him on his behalf.
In Sample v. Louisiana Oil Refining Corp. et al., 162 La. 941, 111 So. 336 (1927)., the Supreme Court decided a case which involved, at least in part, the question here presented. There Mr. Sample claimed to own certain mineral rights during a period from February 15, 1914 to April 15, 1915. He sought to recover money, to cancel a lease, and to have recognized his exclusive right to exploit minerals on the land involved. Apparently there had been production from the mineral servitude under a lease executed by a corporation of which Mr. Sample was a shareholder; Sample apparently depended on the mineral development under that lease to sustain his claim that liberative prescription was interrupted, preserving his mineral servitude. The Court held that Mr. Sample’s rights had prescribed, stating:
“ * * * If he was no party to that contract, the development under the contract was not development by him, and his mineral rights prescribed on April 15, 1915. The plea of prescription of 10 *220 years is good on this score for nonuser of a servitude.” (111 So. 337).
The opinion on this point in the Sample case is so brief and the background so obscure that it might have gone unnoticed in the absence of a note at 26 Tulane Law Review 23, 28, where the late Eugene A. Nabors (who was no doubt familiar with the factual situation giving rise to the Sample case) commented that the Sample case held that:
“drilling and producing operations by the lessee of another person have no effect on prescription.”
Mr. Nabors observed that Civil Code Articles 793 and 794 might have been employed. These code articles were mentioned in Frost Lumber Industries v. Republic Production Co., 112 F.2d 462, 465 (CCA 5 1940). Civil Code Articles 793 and 794 were included in a list of citations to support the following statement by the Court:
“(8) To preserve the right of servitude and prevent prescription from running against it, it is not necessary that it should be exercised exclusively by the owner to whom it is due, or by those who use his rights or who represent him directly, as the usufructuary, lessee or tenant, the attorney in fact or agent. It suffices if the servitude has been exercised by workmen employed by the owner, by someone acting in his right, ‘or by his friends, or those who come to see him.’ ”
This paragraph was among those which laid out general principles of mineral 'law in Louisiana and did not seem to be essential to a decision of the issues presented to the Court.
The problem seems to have been mentioned in another case more recently decided. It was stated in Pan American Petroleum Corp. v. O’Bier, La.App., 201 So.2d 280 (1967) that:
“(3) Inherent in our jurisprudence bearing upon the interpretation of mineral servitude doctrines with reference to public policy is the requirement that the use of the servitude be exercised by or on behalf or in the interest of the owner of such rights.” (201 So.2d 284)
Here again, however, if the statement was intended to say that only the owner or one acting on his behalf has the power to use a mineral servitude in order to interrupt prescription, the remarks were almost gratuitous. In the Pan American case the questions were: (1) was the domestic use of a small amount of wellhead gas by a dwelling on the leased premises user of the servitude ? and (2) did the payment of shut-in royalty constitute user which’ would interrupt prescription? Again, Civil Code Articles 793 and 794 were mentioned; the Court concluded that “the use contemplated [by these articles] must be accomplished by the intent to relate the act to the exercise of the servitude.” The Court held that domestic use of wellhead gas in one dwelling from a capped well did not constitute user of the mineral servitude. The Court apparently predicated its holding more upon the nature of the use than the identity of the person who was said to be using the servitude.
The provisions of Civil Code Articles 793 and 794 are as follows:
“Article 793. To preserve the right of servitude and prevent prescription from running against it, it is not necessary that it should be exercised exclusively by the owner to whom it is due, or by those who use his rights, or who represent him directly, as the usufructuary, the lessee or tenant, the attorney in fact or agent. It suffices if the servitude has been exercised by workmen employed by the owner, or by his friends, or those who come to see him.”
“Article 794. The servitude is preserved to the owner of the estate to which it is due, by the use which any one, even a stranger, makes of it, provided it be used as appertaining to the estate.
“Thus the servitude is preserved to the owner by the use which a possessor in *221 bad faith, who is in possession of the estate to whom (which) it is due, makes of the servitude.
“But if any one passes over the land of another, considering the way as public, or as belonging to another estate, the owner of the estate to whom the servitude is due, can not avail himself of the use thus made of the servitude to protect himself against the prescription which may have been acquired against himself.” (Emphasis supplied).
What the last clause in the first sentence in Article 794 means is open to interpretation. It may be that it is not possible to apply this clause to the question involved in this case. The mineral servitude is not an obligation owed by one estate to another; therefore some Code articles concerning the relations arising from predial servitudes can only be applied by analogy, if at all.
It is also possible that Civil Code Article 804 should be considered with reference to the problem presented in this case. It states:
“Article 804. When the prescription of nonusage is opposed to the owner of the estate to whom the servitude is due, it is incumbent on him to prove that he, or some person in his name, has made use of this servitude as appertaining to his estate during the time necessary to prevent the establishment of the prescription.”
A resort to Planiol indicates that it was the opinion of French jurists that a stranger might interrupt (or commence the running of) prescription.
The translation of Planiol, found in Paragraph No. 2978 on page of Volume 1, Part 2, states:
“The time from which the delay of non-use is counted varies according to circumstances. For discontinuous servitudes, which are made use of by isolated acts, the prescription begins to run from the day when the last use was made of the servitude (Art. 707). As regards continuous servitudes, use of which is made through means of a natural or artificial state of fact, the starting point is the day when an act was performed contrary to the servitude (Art. 707). The servitude, for example may have consisted in having a window too neaf to the neighbor’s land, or a dam across the river resting on the other bank. The thirty years will begin to run from the day when the window was obstructed or the dam removed. And the same thing takes place as to the servitude of not building. Thirty years after the commencement of construction, the demolition of the house could no longer be exacted by the owner of the dominant estate.
“It makes no difference what cause provoked the interruption in the use of the continuous servitude. The law does not require that the act which is contrary to the servitude be the work of the owner bound by it. The person who performed the act is therefore a matter of no significance. It may even be a third person, who, for example, may cut the pipes of a conduit or of an aqueduct bringing water to the dominant estate. The interruption may even be brought about by a fortuitous circumstance. The breaking of pipes is sometimes accidental. The non-use nevertheless plays its part. It has been so held as regards a servitude of support, after a dam had been carried away by a flood in the river (Cass., March 3, 1890, D.91.1.37).”
The question before us may be couched in terms other than whether a stranger can interrupt the running of prescription. The question may be whether the owner of the subservient estate (the surface owners) through their agents (lessees and assigns) can interrupt liberative prescription by exercising for themselves the rights which form the subject of the servitude.
In Pan American v. O’Bier (supra), the Court quoted the following from Union *222 Oil Company of California v. Touchet, 229 La. 316, 86 So.2d 50:
“ ‘ * * * it is a firmly entrenched principle of Louisiana mineral law that no act on the part of a landowner will have the effect of extending the life of a mineral interest unless it is shown that there was a clear intention on the part of the landowner to achieve that very result.’ ”
An examination of Union v. Touchet shows that the quotation cited did not refer to the performance of a physical act, nor to the exercise of the rights which formed the subject of the servitude. It was argued that a document which had been executed had the effect of interrupting prescription against certain interests. The Court stated that it would have been possible for the landowner to express his intention to interrupt prescription and start it running anew. Then followed the quotation cited above. Therefore, if the question before us is in reality whether the landowner, who owns no minerals, can interrupt prescription by the production of minerals, it is a new problem in the mineral jurisprudence of our state.
It has been stated that a mineral owner might ratify unauthorized drilling operations on his mineral servitude. Nabors, 26 Tulane Law Review 23, 28. If a mineral owner discovers during the life of his mineral servitude that an unauthorized person is in the act of extracting minerals without any authority from any mineral owner, reason and common sense require a conclusion that the mineral owner would be able to protect his exclusive rights to drill and to produce. That a mineral owner would not have a right to recover from one who wrongfully produces minerals has not been seriously questioned in our jurisprudence. The practicalities of a situation in which a mineral owner actually discovers production by one who is without authority to produce may prevent such case from ever arising. It does seem inconceivable that the law would prevent the mineral owner from securing, by ratification or some similar process, the advantages accruing from unauthorized production, timely discovered.
If, then, the mineral owner can adopt unauthorized production, and take advantage of the unauthorized user of the servitude to interrupt prescription, at a time during which the minerals are being extracted, what reason is there to prevent his adoption of the unauthorized user in order to interrupt prescription, when that user is discovered by him years after it has terminated ?
Only Sample v. Louisiana Oil Refining Corp. (supra) prevents an easy disposition of this issue by resort to the plain words of Civil Code Article 794. Two significant observations about Sample can be made: (1) Sample was making the same demand for himself and for Nabors Oil & Gas Co., in which he was a shareholder, that Nabors Oil & Gas Co. had made and lost five years earlier; and (2) Sample’s claimed mineral servitude was in reality a “reversionary interest” only, since he had sold all the minerals in February, 1904, then had sold the land in April, 1905, reserving all the minerals. The substance of the Sample case disappeared when later jurisprudence disposed of the “reversionary interest” claim. Liberty Farms v. Miller, 216 La. 1023, 45 So.2d 610 (1950); Hicks v. Clark, 225 La. 133, 72 So.2d 322 (1954). Under those circumstances, Sample should not control the issues in the case before us.
One other consideration should be noted. To hold that production in the instant case did not interrupt prescription would be to encourage a type of lawless exploration and production, and to reward success in preventing discovery by the mineral owner until the production is sold and the well is capped and abandoned. Public policy should require that such a result be avoided.
Consequently, we hold that the drilling and exploration by the assignees of defendants’ lessees, described in the peti *223 tions here filed, effectively interrupted the running of liberative prescription against plaintiffs’ mineral servitude.
To prevent unnecessary litigation in the trial court, it is appropriate to review the other aspect of plaintiffs’ demands— that defendants account to plaintiffs and return funds received for leases, rentals and royalties from lands involved. The demand is made, not against one who trespasses and produces, but against the landowner, who has received monies under a “top-lease,” and has received money for a share of production under such a lease. That the producer might be liable to plaintiffs, except for prescription, is not questioned. The producer is not before us.
No authority has been suggested by plaintiffs to support their demand for lease bonus monies or delay rentals. If a landowner is offered money by a prospective lessee, who is purchasing a hope that his “top-lease” will mature and increase in value, we know of no rule of law or morality that would oblige him to convey it to the true owner of the mineral rights involved. Nor can we find an obligation in the statutes or jurisprudence that requires the defendants to pay the plaintiffs royalty payments received by the defendants when the plaintiffs were the rightful owners of the mineral servitude.
Plaintiffs theorize that estoppel, implied agency, or stipulation pour autrui would require defendants to account and pay. Neither theory is applicable to the situation before us. Nor is a theory under the quasi-contractual provisions of the Civil Code. Defendants have not undertaken the management of the affairs of the plaintiffs. As for the concept of unjust enrichment, Civil Code Article 2301 requires that one who receives what is not due him must restore it to the one from whom he received it; there is no requirement that one who received a payment due another must search out the true creditor and deliver the funds to him. The obligation runs from him who received the payment to him who paid. The one who was entitled to receive the payment retains that right until it is prescribed; he does not acquire an additional debtor by the misapplication of the payment by the original debtor.
For these reasons we agree with the trial court that the plaintiffs cannot require the defendants to account for monies received for leases, royalties or shut-in royalties from lands here involved. However, since drilling as alleged did interrupt prescription, plaintiffs’ petition does state a cause of action to obtain a decree that plaintiffs are owners of the oil, gas and other minerals in and under the following described property:
That portion of the Northeast Quarter (NE/4) of Section 6, Township 12 North, Range 10 West, lying North and East of the Texas and Pacific Railroad right-of-way; the Northeast Quarter (NE/4), the East Half of the East Half of the Northwest Quarter (E/2 of E/2 of NW/4), and that portion of the South Half (S/2) of the section, lying North and East of the railroad right-of-way; all in Section 31; Northwest Quarter (NW/4) of Section 32, Township 13 North, Range 10 West, all in Red River Parish, Louisiana.
The judgment of the district court is reversed, the peremptory exceptions are overruled, .and the case is remanded to the district court for proceedings not inconsistent with this opinion. The appellees are cast with the costs of this appeal; the disposition of other costs is to await final adjudication.
Rehearing denied.
GLADNEY, J., dissents from refusal.