LOLLEY, J.
| ,In this consolidated matter, the defendants, Wyeth Hardey Worley, Martha Jane Worley Jackson, Judith Eleanor Wolf, and Penuel Haynes Worley (the ‘Worleys”), appeal the judgment in favor of the plaintiffs: (1) Joe D. Magee and Joann Fulmer Magee, and (2) Howard Charles Talley, Shirley Kay Kauffman Talley, Jeffrey Charles Talley, Amy Deville Adams Talley, Boby W. Adams, and Anne E. Adams, granting the motions for summary judgment against the Worleys. For the following reasons, we conclude that an issue of material fact exists making summary judgment improper as a matter of law. We reverse the trial court’s grant of summary judgment and remand for further proceedings.
Substantive Facts
On January 2, 1958, Wyeth B. Worley, by Act of Sale conveyed a tract of land (176.6 acres) to the plaintiffs’ predecessor, Chester B. Magee (“C.B. Magee”), husband of June Timmons Magee. Worley reserved a 100% mineral servitude (the Worley Servitude”). The Worleys claim to still be owners of the Worley Servitude and dispute the plaintiffs’ claim that the servitude became extinguished by nonuse between 1987 and 1997. In 1993-94, the Worleys’ ownership in the Worley Servitude was held in trusts with Commercial National Bank (“CNB”) as Trustee of the Dessie Mae Worley Grantor Trust and as Trustee under the Will of Wyeth B. Wor-ley for the benefit of Dessie Mae B. Wor-ley (the Worley Trusts”).
Following the 1958 sale of the property, several transfers of ownership occurred until the property was ultimately acquired by Joe Magee and Joann Fulmer Magee (the “Magees”). In 1998, the Magees 12conveyed a portion of the property to *909 Leon and Sharon Miletello and reserved a one-half mineral interest. The Miletellos in turn conveyed the property to Howard Charles Talley and Shirley Kay Kauffman Talley by Act of Sale dated January 9, 2003, with no reservation of minerals.
The following chronology of events regarding well activity on the property occurred:
Jan. 2, 1958: The Worley Servitude created; two wells already existed on the property, which ceased production in 1970 and 1972;
Nov. 26, 1959: The W.B. Worley 1-C Well (Serial No. 77593) spudded, but never produces;
May 12, 1973: The Worley #1 Well (Serial No. 142545) is spudded; well ceases production, is plugged and abandoned in 1981;
Mar. 23, 1983: The Worley #1 Well (Serial No. 185356) (the “Worley Well”) is spudded pursuant to a permit issued by the Department of Conservation to Vernon E. Faulconer, Inc. (“Faulconer”);
Nov. 1, 1987: The Worley Well ceases commercial production;[1]
June 14, 1989: Faulconer and the other working interest owners execute an Assignment and Bill of Sale in which they assign the lease and interest in the Worley Well to C.B. Magee (the “Assignment”);
Nov. 15, 1993: The Worley Trusts executed a Declaration of Adoption of Operations by Another regarding Ma-gee’s operations in the Worley Well (the “Adoption Declaration”);
Oct. 26, 1999: PET SU57 Palmer No. 1 Well (Serial No. 223541) is spudded; well ceases production and is plugged and abandoned in 2001; and
laMar. 28, 2010: RE SU 60 Murphy 5H No. 1 Well (Serial No. 240650) is spudded.[2]
Of specific pertinence regarding the Worley Well are the agreements that were made in connection with that well. On June 14,. 1989, an Assignment was entered into between Faulconer and C.B. Magee, which was recorded under Registry No. 510250 in Book 643, page 812 of the DeSo-to Parish, Louisiana conveyance records. Among other provisions, the Assignment stated:
1. The lease, well and equipment covered by this assignment are sold on an “as is” basis without any warranty whatsoever, either express or implied, and Assignee [i.e., C.B. Magee] shall have no recourse against Assignors for failure of title or for defects in the well and equipment.
* * * ⅝ * *
3. ... Assignee also obligates itself to comply and conduct its operations hereunder in accordance with all rules and regulations of the commissioner of Conservation of the State of Louisiana and all statutes, rules and regulations of any other governmental body or agency having jurisdiction over such matters.
4. ... Assignee, by the acceptance of this Assignment, agrees to promptly plug and abandon said well upon termination of operations on the lease acreage in a good, workmanlike manner and in accordance with the terms of said lease *910 and/or Conservation Commission rules and regulations^]
Further, on November 15, 1993, an Adoption Declaration was executed by CNB and C.B. Magee and was filed on November 19, 1993, in Registry No. 535360 in Book 694, page 316 of the DeSo-to Parish, Louisiana Conveyance Records. That Adoption Declaration acknowledged the Assignment to C.B. Magee, and described the actions by Magee upon |4his “acquisition” of the well in 1989, noting that Magee’s “use of the gas from the well, for residential purposes, constitutes a use of the mineral servitude which continually interrupts the running of prescription, so long as the gas is used[.]” The Adoption Declaration noted that the Worley Trusts had become aware of C.B. Magee’s usage and wished to “adopt” the “operations of C.B. Magee in using gas from [the Worley Well] pursuant to the provisions of Articles 44, 45 and 46 of the Louisiana Mineral Code....”
Finally, on March 31, 1994, C.B. Magee signed a letter dated March 1, 1994, addressed to CNB, as trustee of the Worley Trusts. In that letter, Magee noted he was the surface owner of the property affected by a mineral servitude in favor of the Worley Trusts. He explained that he had run a “small line from [the Worley Well] to my house and barn and have used this gas from the well for residential purposes since that time, up until the present time.... ” He further stated in his letter his understanding that this residential use “continually interrupts the running of prescription,” and that he agreed to pay $5.00 per month to CNB, as trustee, for the gas used, effective April 1,1994.
Procedural Facts
Two separate actions were filed at the trial court, both naming the same Worley defendants. The plaintiffs in the first action were the Magees. The second action was filed by Howard Charles Talley, Shirley Kay Kauffman Talley, Jeffrey Charles Talley, Amy Deville Adams Talley, Boby W. Adams, and Anne E. Adams (the “Tal-leys”). Early in the litigation, the | .¡matters were consolidated at the trial court.[3] The Magees sought a declaratory judgment against the Worley defendants, seeking to have the Worley Servitude released. The Magees and the Worleys filed cross motions for summary judgment. The trial court heard argument on the Worleys’ motion, but not the Magees’, whose motion had been improperly made before the Worleys had filed an answer to the petition. The trial court denied the Worleys’ motion for summary judgment.
Subsequently, the Magees refiled their motion for summary judgment, and a hearing was conducted. The trial court granted the Magees’ motion. Afterwards, the Talleys and the Worleys stipulated that if the Talleys “were to present to [the trial] Court the identical issue of whether that mineral servitude had prescribed, [the trial] Court would rule identically that the servitude terminated on or before November 1, 1997, as a result of the prescription of non-use[sic][.]” The Talleys and the defendants agreed to the stipulation “with the expectation that the [trial] Court [would] issue one judgment disposing of both of these consolidated cases on the same ground, i.e., the termination of the aforesaid mineral servitude on the ground of accrual of prescription for nonuse.” Ultimately, the trial court signed a judgment, granting summary judgment in favor of *911 both the Magees and Talleys. This appeal by the Worleys ensued.
| (¡Discussion
There is only one assignment of error by the Worleys: did the trial court err in granting summary judgment on the issue of whether the Worley Servitude had terminated on the basis of prescription of nonuse, in light of the residential use of the gas from the Worley Well by the Ma-gees’ predecessor in title? Notably, the trial court opined in its written ruling “that residential use of gas alone is not sufficient to interrupt prescription.” (Emphasis added).
The summary judgment procedure is favored and is designed to secure the just, speedy, and inexpensive determination of actions. La. C.C.P. art. 966(A)(2). Appellate courts review summary judgments de novo under the same criteria that govern the trial court’s consideration of whether summary judgment is appropriate. Cavet v. Louisiana Extended Care Hosp., 47,141 (La.App.2d Cir.05/16/12), 92 So.3d 1122. A motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. See La. C.C.P. art. 966(B). The burden of proof on a motion for summary judgment remains with the movant. Samaha v. Rau, 2007-1726 (La.02/26/08), 977 So.2d 880.
The only issue before us is whether the residential usage of gas by C.B. Magee was sufficient to interrupt the running of prescription of nonuse on the Worley Servitude. A reservation of minerals is extinguished by ^prescription of nonuse if not exercised within ten years, and a mineral servitude owner then loses his rights unless some event or condition intervened during that time to interrupt the running of prescription. Cohort Energy Co. v. Caddo-Bossier Parishes Port Com’n, 37,449 (La.App.2d Cir.08/20/03), 852 So.2d 1174. An interruption takes place by the actual drilling or production operations of a well, such as the Worley Well, on the land burdened by the servitude. La. R.S. 31:30 and 36.
In this case, if sufficient production occurred during the 1993-94 time period as alleged by the Worleys, it allegedly served to interrupt the prescription of non-use between the time of the cessation of commercial production by the former lessee for the Worley Well in 1987 and commencement of the Palmer No. 1 Well in 1999. Although emphasis has been made on the sufficiency of the production by C.B. Magee (i.e., whether his residential usage of gas from the well was in good faith and for some beneficial purpose), we find significant the agreements made in connection with that usage and will address those first.
The issue of “By Whom a Use May Be Made” is contained in Subpart C of Chapter 4 of the Mineral Code (i.e., La. R.S. 31:42, et seq.). The pertinent statutes in Title 31 state:
§ 42. By whom a mineral servitude may be used
Except as provided in Articles 44 through 52, use of a mineral servitude must be by the owner of the servitude, his representative or employee, or some other person acting on his behalf.
|s§ 43. When a person is acting on behalf of servitude owner
A person is acting on behalf of the servitude owner only when there is a legal relationship between him and the servitude owner, such as co-ownership or agency, or when there is clear and convincing evidence that he intended to act for the servitude owner. Silence or *912 inaction by the servitude owner will not suffice to establish that a person is acting on behalf of the servitude owner. § 44. Adoption of operations by another
A mineral servitude owner may adopt operations or production by a person other than those designated by Article 42 if his servitude includes the right to conduct operations of the kind involved.
⅜ ⅜ * ⅜ ⅝ ⅜
§ 46. Procedure of adoption
Adoption of the operations of another is accomplished when the servitude owner files for registry in the conveyance records of the situs of his servitude an instrument describing the land subject to the servitude, identifying the operations, specifying the date on which the operations commenced, and expressing the intent to adopt them as his own.
Here, the use of the Worley Well was assigned to C.B. Magee by certain holders of the lease, primarily Faulconer, on June 14, 1989. Although the continued existence of the Faulconer lease in 1989 was questionable after the two-year lapse of commercial production, Magee began using the Worley Well. Significantly, the Assignment was recorded in the public records of DeSoto Parish. Additionally, the Adoption Declaration further substantiated the fact of C.B. Magee’s use of the Worley Well, and possible exercise of rights under the Worley Servitude. The Worley Trusts acknowledged that C.B. Magee: had run a “small line” |9from the Worley Well to his house; was using the well for residential purposes; and, intended to interrupt prescription by his usage. The Adoption was filed in the public records of DeSoto Parish, Louisiana and adhered to the requirements stated in La. R.S. 31:46. These agreements are significant to serve notice of some operations on the surface.[4]
Turning to the issue of the sufficiency of the use, La. R.S. 31:86 provides, “Prescription of nonuse is interrupted by the production of any mineral covered by the act creating the servitude. The interruption occurs on the date on which actual production begins and prescription commences anew from the date of cessation of actual production.” Louisiana R.S. 31:38 states, “To interrupt prescription it is not necessary that minerals be produced in paying quantities. It is necessary only that minerals actually be produced in good faith with the intent of saving or otherwise using them for some beneficial purpose.”
In considering whether C.B. Magee’s use and production of the well was sufficient to interrupt prescription of the servitude for nonuse, the trial court relied on the holding in Pan Am. Petroleum Corp. v. O’Bier, 201 So.2d 280 (La.App. 2nd Cir. 1967), for the proposition that residential usage is insufficient to interrupt prescription. However, although O’Bier has facts 110similar with this case, we agree with the appellants that O’Bier can be easily distinguished and is not controlling in this case.
O’Bier was rendered in 1967, prior to the adoption of Louisiana’s Mineral Code in 1974.[5] Thus, the O’Bier court did not have the Mineral Code to rely upon for authority, but instead considered analo *913 gously the applicable Civil Code articles pertaining to predial servitudes. Notably, none of the articles on adoption of usage now set forth in the Mineral Code, particularly Article 46, had parallels to the Civil Code articles for predial servitudes at the time O’Bier was written.
In O’Bier, the mineral servitude owners contended that their interest had been preserved against the plea of prescription for nonuse, primarily by the production of gas from a shut-in well for residential use by the surface owner. Unlike the case at hand, no recorded adoption declaration was ever filed by the servitude owner as no such procedure for adoption was in our law at that time. Concluding that such use did not serve to interrupt prescription by nonuse, the O’Bier court noted that “the use contemplated therein must be accompanied by the intent to relate the act to the exercise of the servitude.” Id. at 284. Although the facts in O’Bier, fail to show that there was intent by the servitude owner to relate the act of the residential use of gas to their servitude, that does not appear to be the situation in the|ncase sub judice, because of the Adoption Declaration. We therefore disagree with the trial court that O’Bier is controlling in this case.
The crucial distinction in O’Bier to the facts of this case is that the use of the Worley Well had been assigned to C.B. Magee, the Assignment had been recognized by the Worley Trusts, and Magee’s production of the gas from the well on the Worley Servitude was purportedly adopted as evidenced by the Adoption Declaration. Both of those documents had been recorded in the public records, putting third parties on notice that Magee had exercised an interest in the subject well and was purportedly deriving some benefit from it with the agreement of the Worley Trusts. Clearly, not only were the pertinent parties informed of C.B. Magee’s activity at the well, but third parties were also put on notice by the recordation of the Assignment and the Adoption Declaration. This was not the same sort of surreptitious and unknown activity that had occurred in O’Bier.
Though O’Bier is not controlling, the measure of the sufficiency of C.B. Magee’s production remains. The test of that sufficiency under Article 38 of the Mineral Code includes the factual consideration of good faith applicable to both C.B. Magee and the Worley Trust and the beneficial purpose of the production endeavor. These fact issues require trial on the merits, as material fact issues are apparent from the record for this summary judgment.
[^Conclusion
For the foregoing reasons, we reverse the judgment granting summary judgment in favor of the appellees: Joe D. Magee and Joann Fulmer Magee; and, Howard Charles Talley, Shirley Kay Kauffman Talley, Jeffrey Charles Talley, Amy Deville Adams Talley, Boby W. Adams, and Anne E. Adams. This consolidated matter is remanded to the trial court for further proceedings, and all costs of appeal are assessed to the Magees and the Talleys.
REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.
APPLICATION FOR REHEARING
Before BROWN, CARAWAY, MOORE, LOLLEY and SEXTON, JJ.
Rehearing denied.
BROWN, C.J. and SEXTON, J., would grant rehearing

. The parties agree on this fact, which is confirmed by the records of the Office of Conservation for the State of Louisiana, which show that the last actual reported production occurred in October 1987.

. Both units for the last two wells drilled in 1999 and 2010 included the entire 176.6 acres.

. The allegations by the Talley plaintiffs are substantially the same as those made by Ma-gee plaintiffs, so for convenience, reference herein is made only to the Magee plaintiffs’ litigation,

. C.B. Magee’s March 1994 letter to the Wor-ley Trust regarding the subject use specifically acknowledges the Worley Servitude and his intent to interrupt prescription. Had Magee actually owned the land upon which the Wor-ley Well was situated, this letter may have served to interrupt prescription in and of itself. See La. R.S. 31:54, et seq. The record indicates, however, that the portion of the 176 acre tract where the well was located had been previously conveyed by C.B. Magee to his son.

. In the Introduction to the Mineral Code by the Louisiana State Law Institute, it states, "The Mineral Code is designed in large measure to supplant by way of Codification the *913 extensive jurisprudence that developed in this area of the law.”