**54 So.2d 1**

**TAYLOR et al. v. KIMBELL et al.**

No. 39991.

June 29, 1951.

Goff & Gaskey, Arcadia, for defendants-appellants.

Colvin & Hunter, Mansfield, for plaintiffs-appellees.

FOURNET, Chief Justice.

The plaintiffs, who executed an oil, gas, and mineral lease under date of June 22, 1944, on their 760 acre tract of land located in Sections 29, 30, 31, and 32, Township 12 North, Range 11 West, De Soto Parish, Louisiana, instituted proceedings against the defendants George T. Kimbell and Hassie Hunt Trust for the cancellation of that portion of the lease that had been assigned to the defendants and affecting 600 acres thereof, on the ground that it had expired under its own terms. In the alternative, they pray for the cancellation of the lease with the exception of ten acres surrounding and including the well drilled on the premises. They are also asking $1,500 attorney's fees because of the defendants' failure to cancel the lease upon demand.

In answer to this suit it is claimed that the well drilled within the primary term of the lease is capable of producing gas in paying quantities, but is shut in because of lack of market for the gas, and that the lease should not be cancelled inasmuch as the defendant Kimbell tendered $50 to the plaintiffs before the end of the primary term, which was sufficient under the provisions of the lease to maintain it in force until June 22, 1950. In the alternative, they prayed that they either be given additional time in which to secure a market for gas from the well, or additional time in which to conduct further operations on the premises. From a judgment of the lower court maintaining the plaintiffs' primary demand, ordering the cancellation of the lease and payment of $1,500 attorney's fees, the defendants prosecute this appeal.

Under the provisions of the original lease, which is for a term of five years from June 22, 1944, and "as long thereafter as oil, gas or other mineral is produced from the said land" (Art. 2), there is incorporated the stipulation that "Where gas from a well producing gas only is not sold or used because of no market or demand therefor, lessee may pay as royalty $50 per well, per year, payable quarterly, and upon such payment it will be consid-

ered that gas is being produced within the meaning of Article 2 of this contract."

R. L. Corley, who had acquired all of the interest of the original lessee on June 30, 1944, on the same date transferred to defendant Hassie Hunt Trust (hereinafter referred to as the Trust) all of his interest in the portion of the lease here under consideration, affecting some 600 acres. On January 16, 1946, the Trust assigned its interest only in so far as it covered and applied to 120 acres thereof, to G. H. Vaughn, Jr., who, on June 15, 1946, re-transferred the same to the Trust. The defendant Kimbell subsequently assumed the obligations of the assignee Trust to drill on this property under a sublease, and in conformity with this obligation he drilled a well in early 1948 which came in with an open flow capacity of 2,225,000 cubic feet of gas per day and some salt water. A test on April 11 showed salt water production between fifty and fifty-five barrels per million cubic feet of gas produced. With leave of the Department of Conservation the well was permitted to flow uninterruptedly on a three-quarter inch choke, the well being flared for a period of about 83 days in the belief that oil would eventually be produced—but without success. During the test period production of gas had gradually declined, so that on June 30, 1948, production was only 306,000 cubic feet (or approximately 1/4th of the quantity produced at the beginning of the test on April 12), at which time the well was ordered shut in by the Conservation Department. On June 7 of the year following (just prior to the lapse of the primary term of the lease—the annual delay rental necessary to maintain the lease in force without drilling having been paid during each year of the primary term, including the period following the shut-in of the well), the defendant Kimbell tendered to plaintiffs $50 as shut-in gas well royalty by depositing this amount to their credit in the First National Bank in Mansfield, in payment for the right to maintain the lease for an additional year, claiming that the well had been shut in because of inability to market the gas; but plaintiffs refused to accept the payment.

Under the plain terms of the lease contract, the primary term having expired, all rights granted the lessee under the lease have terminated unless the record shows that the gas well drilled on the premises can be classed as a producer in paying quantities and was shut in because of no market or demand for the gas. See Caldwell v. Alton Oil Co., 161 La. 139, 108 So. 314; Logan v. Tholl Oil Co., 189 La. 645, 180 So. 473; and Vance v. Hurley, 215 La. 805, 41 So.2d 724.

The plaintiffs offered the testimony of Mr. B. O. Dickerson, gas engineer of the Department of Conservation's minerals division, who in his official capacity conducted tests on the well shortly after it was brought in. He expressed the opinion

that the well would never be an oil producer; that the gas produced was solution gas from a gas cap of small magnitude, as indicated by the gradual decreasing pressure and decreasing flow; and that although when such a well is shut in the gas continually comes out of solution and causes the production to build up again, his tests indicated the well would soon log up with salt water and cease producing altogether within a short period of time. In corroboration, the plaintiffs offered the testimony of Mr. W. K. Williams, an experienced oil operator with an oil well producing in the same field, who said the only way to produce the gas would be by equipping the well with a standard rig, and under those conditions it would not pay.

The defendant Kimbell testified that in his opinion the pressure decline and also the decline in the capacity of the well to produce could be remedied; it was his intention to produce the gas. He also expressed the opinion that it was solution gas, as testified to by Mr. Dickerson, and stated that if he were permitted to produce the well and could find a market for the gas, the minimum quantity he could produce profitably, at a price of four to six cents per thousand cubic feet, would be 150,000 to 200,000 cubic feet, which would yield a revenue of $200 to $300 per month. Production would be accomplished by separating the water from the gas with a pumping unit, which admittedly would require a man to attend it; and when asked whether he was still of the opinion that the well could produce in paying quantities under the conditions outlined by him, he answered: "Yes, and we were going to offset it."

From the foregoing it does not appear to us that the well is capable of producing in paying quantities. While it is possible that by some process of reworking the well, or further experimentation with it, the defendant might bring in a well producing oil or gas in paying quantities, it nevertheless appears that he did not put faith in the capacity of the well to maintain his lease at the expiration of the fourth year of the primary term, for after attempting to bring in an oil well through flaring the gas (some 83 days) in the hope that oil would follow, he shut the well in and continued the lease in effect by paying the annual delay rental; and it was only when the primary term was about to expire that the $50 was tendered in an attempt to continue the lease in effect. It is our opinion that the defendants have failed to show by a fair preponderance of the evidence that the well was capable of producing gas in paying quantities.

The alternative prayer of the defendants that they be given additional time (60 days after judgment) within which to conduct further operations on the premises or secure a market for the gas, cannot be

entertained. The last operations conducted by Kimbell took place on June 30, 1948, a full year before expiration of the primary term. Defendants' position is based on the premise that the well is capable of producing in paying quantities, and in view of our finding above, the authorities relied on to support their plea for additional time are not pertinent either from a factual or a legal standpoint. Their further argument that if plaintiffs considered that operations were not being conducted in accordance with the lease they were required by the provisions of Article 9 thereof to notify defendants of the facts relied upon as constituting a breach and allow them a period of sixty days after receipt of such notice within which to comply with their obligations, is without merit, since such a clause refers to drilling operations within the term of the lease and can have no application after its termination. Sittig v. Dalton, 195 La. 765, 197 So. 423; Producers' Oil & Gas Co., Inc., v. Continental Securities Corporation, 188 La. 564, 177 So. 668.

The defendants apparently concede the $1,500 awarded by the lower court for attorney fees is fair compensation for the prosecution of this suit to force cancellation of this lease, which they refused to acknowledge had terminated when demanded to do so, for they only state in brief that the plaintiffs are not entitled to attorney fees unless they are successful in the suit.

For the reasons assigned, the judgment of the district court is affirmed.