471 So.2d 889 (1985)
Vernon E. WEBB, et al, Plaintiffs-Appellees,
v.
The HARDAGE CORPORATION, Defendant-Appellant.
No. 17016-CA.
Court of Appeal of Louisiana, Second Circuit.
June 12, 1985.
Supplemental Opinion August 21, 1985.
*890 Kennedy, Goodman & Donovan by John M. Frazier, Shreveport, for defendant-appellant.
Bethard & Davis by James G. Bethard, Coushatta, for plaintiffs-appellees.
Before HALL, FRED W. JONES, Jr. and SEXTON, JJ.
HALL, Judge.
In this appeal by a mineral lessee from a judgment ordering cancellation of three mineral leases, the principal issue is whether the leases were maintained in force and effect under the shut-in clause of each lease. Finding that this issue and the other issues raised by the parties were correctly resolved by the trial court in favor of the lessors, we affirm the judgment.
In May 1976, the plaintiffs, Vernon W. Webb, Clarence H. Smith, Jr., and Jim W. Wilson, leased the mineral rights to three tracts of land in Red River Parish to Enerco, Inc. Because the three separate leases covering the three separate tracts each had a primary term of 5 years, they expired in May 1981 unless continued in effect beyond the primary term by activities of the lessee as provided in the leases.
Enerco filed for bankruptcy in May 1978, and assigned its interests in the leases to William Neary, as trustee, who in turn assigned his interest in the leases to the Hardage Corporation. By another series of transfers, working interest in the leases was given up by Hardage, but was regained by Hardage in February 1983. In the interim, a shallow gas well was drilled on each of the three leased premises. The three wells were drilled in April 1981, one month before expiration of the primary terms of the leases. The wells were cored, logs were run, casing was set, the wells were perforated, and the formation was fracked. However, the only surface testing done to get an indication of production potential was simply igniting the gas at the mouth of the pipes coming from the wells and then observing the flares produced for four or five hours. After the wells were flared in this manner, the wells were then shut-in for lack of a market for the gas. Work on the wells was completed in July, 1981. The initial potential test required by the State Office of Conservation was not performed.
Shut-in royalty payments were tendered but returned. By letters dated August 19, 1981, August 20, 1981, January 19, 1982, *891 and January 20, 1982, lessors notified lessees of non-compliance with the leases, but lessees did no further work on the wells. In May 1982, a gas purchase contract was entered into by an agent of the lessee and Tennessee Gas Transmission Company.
In March 1983, the Hardage Corporation performed an initial potential test on one of the wells. While the state requires that this surface production test, consisting of quantitative measurement of gas production of a well over a twenty-four hour period, be done within a few days after the well is drilled, performance of the test in this instance was delayed for nearly two years. When the Hardage Corporation attempted to perform the test on one of the two other wells, the company official at the well site was escorted from the premises by a sheriff's deputy called by the owner of the land.
That same month suit was filed by plaintiffs against Hardage seeking a declaration that the three leases were terminated, seeking a temporary restraining order and preliminary injunction to prevent Hardage from taking further action on the properties, and seeking damages and attorney fees. A temporary restraining order was issued and, after a hearing, a preliminary injunction was granted. The Hardage Corporation then filed a reconventional demand alleging that damages were due for the wrongful issuance of a temporary restraining order and preliminary injunction, alleging the three leases were still in full force and effect, and alleging that plaintiffs owed attorney fees and damages to Hardage.
After trial, in an opinion rendered in August 1984, the trial court held that the three leases were terminated, and that defendants were indebted to plaintiffs in the amount of $2500.00 for plaintiffs' attorney fees. This appeal by defendants followed; we affirm.

ISSUES PRESENTED
The principle issues presented by this appeal are:
1. Were the leases extended beyond the primary term by virtue of the wells being shut-in pursuant to the shut-in clauses of the leases?
2. Did Paragraph 13 of the leases, a "force majeure" provision, extend the lease beyond the primary term?
3. Did Paragraph 12 of the leases apply so that even if the leases had expired, the lessee was entitled to retain a 40-acre square around each well?
4. Are damages and attorney fees owed by plaintiffs to defendants or by defendants to plaintiffs?

WERE THE LEASES CONTINUED IN EFFECT UNDER THE SHUT-IN CLAUSE?
All three leases at issue were executed on the same form. Paragraph 2 of these leases provides:
2. Subject to the other provisions herein contained, this lease shall be for a period of five (5) years from this date (called "primary term") and as long thereafter as (1) oil, gas, sulphur, or other mineral is produced from said land hereunder or from land pooled therewith, or (2) it is maintained in force in any other manner herein provided. (Emphasis Added)
Another manner provided in the leases for extending their life beyond the primary term is set forth in Paragraph 5 of the leases which provides in part
5. If lessee obtains production of minerals on said land or on land with which the lease premises or any portion thereof has been pooled, and if, during the life of this lease either before or after the expiration of the primary term, all such production is shut in by reason of force majeure or the lack either of a market at the well or wells or of an available pipeline outlet in the field, this lease shall not terminate but shall continue in effect during such shut-in period as though production were actually being obtained on the premises within the meaning of Paragraph 2 hereof....
Thus, the leases at issue could be continued in full force and effect beyond the primary term if production were obtained and the wells were then shut-in for lack of a market.
"Production" as used in Paragraphs 2 and 5 of the leases must be understood in *892 the context of LSA-R.S. 31:124 which provides in part:
When a mineral lease is being maintained by production of oil or gas, the production must be in paying quantities. It is considered to be in paying quantities when production allocable to the total original right of the lessee to share in production under the lease is sufficient to induce a reasonably prudent operator to continue production in an effort to secure a return on his investment or to minimize any loss....
Reading LSA-R.S. 31:124 in conjunction with the terms of the leases, the shutting-in of the gas wells on the three leased properties could only extend the leases beyond their primary terms if the wells were capable of producing in paying quantities. See Taylor v. Kimbell, 219 La. 731, 54 So.2d 1 (1951). Since none of the three gas wells were put into actual production, the questions raised are:
1. Who has the burden of showing the presence or absence of a well's capability of producing in paying quantities?
2. What evidence is sufficient to carry the burden of proving or disproving that capability?
3. Was the burden successfully carried by the party bearing it in this case?
Generally, the lessor has the burden of proving the propriety of cancellation of a mineral lease. Frazier v. Justiss Mears Oil Co., 391 So.2d 485 (La.App.2d Cir.1980), writ denied, 395 So.2d 340 (La.1980). However, the situation encountered in this case presents an exception to that general rule. A lessee cannot place the burden of proving the propriety of cancellation on the lessor by simply alleging that a well that has never been placed into actual production is capable of producing in paying quantities. Rather, the lessee must prove by a preponderance of the evidence that prior to the expiration of the primary term or the continuous drilling operations term a well was completed and surface tested to the extent that the well was at that time demonstratively capable of producing in paying quantities. See Taylor, supra.
Ordinarily, proof sufficient to carry this burden is a finding of commercial productivity resulting from the performing of the initial potential test required by the Department of Conservation. See Lee v. Goodwin, 174 So.2d 651 (La.App.2d Cir.1965). This test, referred to previously, is performed under standard conditions over a twenty-four hour period, and is witnessed by a representative of the Office of Conservation. The test is a necessary prerequisite to classification of the well as a gas or an oil well, and to the obtaining of an allowable and the authority to sell oil or gas from the well. While other kinds of evidence of production potential could also be considered, such as the results of logs and cores, the flaring of the wells for periods of time and the history of the wells in the same zone in the field, the importance of actual testing of surface production is obvious and is the most direct indication of production capability.
The importance of surface testing is illustrated by the provisions of LSA-R.S. 31:34 and 31:90 which address the testing of shut-in wells in the context of interrupting prescription on mineral servitudes and mineral royalties respectively. These statutes, almost identical in language, both provide for interruption of prescription by shut-in wells proved through testing by surface production to be capable of producing minerals in paying quantities. While there might be exceptional cases where the obtaining of production in paying quantities could be established in the absence of an initial potential test, such as where a gas well produces a consistent and large flare over a period of several days or weeks, as a general rule the initial potential test must be conducted during the primary term or the continuous operations term in order to continue a lease in effect beyond the primary and the continuous operation terms. Without such surface testing, the status of the lease would ordinarily remain uncertain while the well is shut-in.
The need for such a general rule is shown by the present case. The results of the logs and cores initially done were insufficient to show the capability of producing in paying quantities. The limited flaring *893 done not only produced flares that varied from well to well, but also from hour to hour on each well. While flaring did at least show the wells were producing some gas at that time, the history of wells in the field strongly indicates that the field is in the latter stages of depletion, that production usually falls off steeply in a short period of time, and that wells drilled are usually "marginal" wells. Thus, the need for additional testing of production potential was all the more important. Although the long-delayed initial potential test for the one well tested now indicates that it is and has been capable of producing in paying quantities, the well's capability and the lease status remained unknown until the test was done, long after the dispute between the lessor and the lessee arose and the demand for cancellation of the lease was made. The capabilities of the other two wells remain unknown and cannot be known under any reasonable, objective standard until the test is made. A lessee should not be able to rely on the shut-in clause to hold a lease beyond its primary term where the well's capacity to produce in paying quantities cannot be determined until further testing and procedures are carried out at some later date.
Thus, we agree with the finding of the trial court that there was insufficient evidence to indicate that the three wells at issue were capable of producing in paying quantities, and we reject defendant's contention that the leases were continued in force beyond the primary term under the shut-in clause of the leases.
Because of our determination that the lessee did not "obtain production" prior to the expiration of the primary term and continuous drilling operations term, it is unnecessary to consider plaintiffs' other contentions that there was an available market for gas and that shut-in royalties were not properly tendered to one of the lessors.

WERE THE LEASES EXTENDED BY THE "FORCE MAJEURE" CLAUSE?
The leases at issue contained a "force majeure" clause in Paragraph 13 which provides in part:
13. When drilling, reworking, production or other operations are delayed or interrupted by force majeure, that is, by storm, flood, or other acts of God, fire, war, rebellion, insurrection, riot, strikes, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, or as a result of some law, order, rule, regulation, requisition, or necessity of the government, Federal or State, or as a result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against the Lessee, anything in this lease to the contrary notwithstanding, but this lease shall be extended for a period of time equal to that during which Lessee is so prevented from conducting such drilling or reworking operations on, or producing oil, gas, casinghead gas, condensate or other minerals from, the premises....
The defendant contends that when the original lessee, Enerco, and one of the sublessees, N.R.G., filed for relief under Chapter 11 of the Bankruptcy Code, the primary terms of the leases were extended during the periods of time the lessees were under the protection of the Bankruptcy Court.
The only legal authority cited by defendant in support for its contention is a Texas case, Gilbert v. Smedley, 612 S.W.2d 270 (Tex.Civ.App.Ft. Worth 1981, writ ref'd. n.r.e.). However, even as mere persuasive authority, that case is distinguishable on its facts. There, an involuntary bankruptcy proceeding was instituted against a lessee. The receiver of the lessee in bankruptcy not only took no action to develop the lease, but also apparently was very uncooperative with either lessor or lessee in regard to development of the lease. Under those facts the Texas court held that the lessees could not be held responsible for the inaction of the receiver over whom they had no control. No similar showing has been made in the instant case. Here, the defendant would have to show that development of the leases was delayed or interrupted by governmental law or regulation or circumstances "beyond the control *894 of the lessee." However, the defendant has presented no evidence to show how the voluntary filing for relief under the bankruptcy laws by the original lessee and a sublessee resulted in such a delay or interruption of development as to be characterized as "beyond the control of the lessee," and thus to trigger the "force majeure" clause in the leases. Therefore, the defendant's claim that the leases were extended beyond the primary terms under the provisions of Paragraph 13 of the leases must be rejected.

WERE FORTY-ACRE SQUARES AROUND EACH WELL RETAINED BY THE DEFENDANT UNDER THE PROVISIONS OF PARAGRAPH 12 OF THE LEASE?
Paragraph 12 of the leases provides:
12. In case of cancellation or termination of this lease from any cause, Lessee shall have the right to retain, under the terms hereof, around each well producing, being worked on, or drilling hereunder... forty (40) acres around each such well in as near a square form as practicable, and in the event Lessor considers that operations are not being conducted in compliance with this contract, Lessee shall be notified in writing of the facts relied upon as constituting a breach hereof and Lessee shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of this instrument.
Since the primary terms of the leases were not extended under the shut-in clause of the leases, by the provisions of the "force majeure clause", or by production, the leases expired at that point beyond the end of the primary term at which operations on the wells ceased. No work of any kind appears to have been done on the wells after July 1981 up until the testing which triggered this lawsuit. Thus, the leases could not have still been in existence beyond July 1981 (or at most 90 days thereafter). Since the leases terminated due to the lessee's failure to perform further operations on the wells, the wells obviously could not be characterized at the time of the termination of the leases as wells producing, being worked on, or being drilled. Therefore, the provisions of Paragraph 12 of the leases do not apply in this case, and the defendant is not entitled to retain 40 acres around each well.

DAMAGES AND ATTORNEY FEES
The Hardage Corporation has requested attorney fees and damages for the wrongful issuance of a temporary restraining order and a preliminary injunction in the event that this court finds the leases are still valid. However, as this court finds the leases at issue are not still valid, the requests for damages and attorney fees are denied.
The plaintiffs also requested damages and attorney fees. The trial court awarded plaintiffs $2,500.00 in attorney fees, but denied damages. We find no error in the granting of the $2,500.00 in attorneys fees. Such an award was appropriate under LSA-R.S. 31:207 which provides:
If the former owner of the extinguished or expired mineral right fails to furnish the required act within 30 days of receipt of demand or if the former lessee of a mineral lease fails to record the required act within 90 days of its extinguishment prior to the expiration of its primary term, he is liable to the person in whose favor the right or the lease has been extinguished or expired for all damages resulting therefrom and for a reasonable attorney's fee incurred in bringing suit.
On appeal, the defendant argues the applicability of LSA-R.S. 31:208 which provides:
The former owner of a mineral right other than a mineral lease is not liable for damages or attorney's fees under Art. 207 if there is a good faith dispute as to whether prescription has accrued, the term of the right has expired, or it has been otherwise extinguished. (Emphasis Added)
A reading of the provisions of LSA-R.S. 31:208 shows that the former owners of a mineral lease, unlike former owners of other mineral rights, are not entitled to take advantage of the good faith dispute provisions. *895 Thus, the trial court was correct to award attorney fees in this case.
While plaintiffs have also requested damages, we note that plaintiffs did not appeal the trial court's decision refusing their request for damages, and did not answer defendant's appeal. Therefore, the issue of the plaintiffs' damages is not properly before this court and will not be considered.
In accordance with the reasons expressed above, the judgment of the trial court is affirmed. All costs of this appeal are assessed to the defendants.
The court's attention has been called to the fact that the opinion erroneously states that the plaintiffs did not appeal or answer the appeal. The plaintiffs did in fact timely answer the appeal, urging their demand for damages and seeking an increase in the amount of attorney's fees. However, plaintiffs have elected not to apply for a rehearing seeking modification of the judgment. Accordingly, the judgment of this court stands as rendered, the sole purpose of this per curiam being to acknowledge the erroneous statement contained in the opinion.
AFFIRMED.