TORBERT, Chief Justice.
This is an appeal by the plaintiffs from a judgment of the Mobile County Circuit Court declaring a certain oil, gas and mineral lease to be “in full force and effect as to all the lands covered by and described in said lease.” We reverse that judgment and remand.
On January 15,1975, the lessor, Hibernia National Bank in New Orleans, Louisiana, as trustee for Barbara Lang Grimes and Virginia Lang Griffin, entered into an “oil, gas and mineral lease” with Harry H. Rid-dick, as lessee. The lease provided for a primary term of five years beginning on January 15, 1975. Riddick later assigned his interest in the lease to a group of investors, who are the defendants in this action. The lease covered 449 net mineral acres.
Shortly after execution of the lease, a portion of the leased acreage was unitized as a part of a 640-acre drilling unit. Pursuant to this lease and another lease involving other property within the unit, Getty Oil Company drilled a well in that unit which proved successful. That well produced from November 1976 until December 1979. On January 2, 1980, the well was shut down and “workover” operations were begun on the well. However, the workover was unsuccessful, and Getty abandoned that well on April 10, 1980. In May 1980, Getty began drilling a new well at a different location within the 640-acre unit. This well has been successful and has continued to produce throughout the litigation of this case.
The plaintiffs notified the defendants in September 1980 that they considered the lease to have expired at the end of the primary term. On September 2, 1981, the plaintiffs filed this action, seeking a declaration that the defendant lessees could not rightfully continue to hold this lease. On April 8, 1985, the circuit court substituted Virginia Helen Griffin as plaintiff in this action in place of Hibernia National Bank. On May 17, 1985, the trial of this case was held in the circuit court on the basis of stipulated facts and brief testimony. On October 1, 1985, the court entered an order declaring the lease to be in full force and effect, and the plaintiffs appeal from that judgment.
It is undisputed that the primary term of the lease expired on January 15, 1980. However, the defendants contend that the “drilling operations clause” in the lease operated to extend the validity of the lease past that time and throughout the period of production of the second well. This clause is a standard one in the industry, and reads as follows: .
“6. If prior to discovery of oil, gas or other mineral on said land or on acreage pooled therewith Lessee shall drill a dry hole or holes thereon, or if after discovery of oil, gas or other mineral the production thereof should cease from any cause, this lease shall not terminate if Lessee commences additional drilling or reworking operations within 60 days thereafter, or if it be within the primary term, commences or resumes the payment or tender of rentals or commences operations for drilling or reworking on or *1010 before the rental paying date next ensuing after the expiration of 60 days from date of completion of dry hole or cessation of production_ If at the expiration of the primary term, oil, gas or other mineral is not being produced on said land, or on acreage pooled therewith, but Lessee is then engaged in drilling or reworking operations thereon or shall have completed a dry hole thereon within sixty (60) days prior to the end of the primary term, the lease shall remain in force so long as operations are prosecuted with no cessation of more than sixty (60) consecutive days, and if they result in the production of oil, gas or other mineral so long thereafter as oil, gas or other mineral is produced from said land or acreage pooled therewith.”
(Emphasis added.)
The plaintiffs, on the other hand, dispute the applicability of this clause where the only production is from a second well which was drilled after the expiration of the primary term. The plaintiffs contend that the “drilling operations clause” can operate to extend the validity of a lease only by virtue of drilling or reworking operations, or production, of the same well as that begun before expiration of the primary term. We find this contention to be correct.
Under a “drilling operations clause,” like that in this case “it is necessary, if the lease is to be preserved, for production to be obtained as a result of the particular drilling operations alleged to satisfy the clause.” Williams, Oil and Gas Law § 617, at 335 (abr. ed. 1984). Under this clause, “the lease is extended only for the purpose of permitting the lessee to complete the well in process.” 4 Kuntz, Oil and Gas § 47.4, at 114 (1972). “When a lease includes a drilling operations clause and a well being drilled at the expiration of the primary term fails to attain commercial production, the lease terminates upon the completion of said well, even though another well, commenced after the expiration of the primary term but before the completion of the well being drilled at the expiration of the primary term, does attain commercial production.” Williams, Oil and Gas Terms 247 (6th ed. 1984). See also, Hemingway, The Law of Oil and Gas § 6.6, at 319-20 (2d ed. 1983). If the lessee wanted production from a second well to extend the validity of the lease past its primary term, a “continuous drilling operations clause” should have been written into the lease. That kind of clause expressly provides that a second well, which is drilled within a certain number of days after abandonment of operations on a first well, either before or after expiration of the primary term, extends the lease by the working operations or production of the second well. See Williams, Oil and Gas Law, supra.
The case of Skelly Oil Co. v. Wickham, 202 F.2d 442 (10th Cir.1953), involved a drilling operations clause being interpreted under facts similar to this case. In that case, the lessee was drilling a well on the last day of the primary term of the lease; it later turned out to be a dry hole. However, before abandonment of the operations on that well, but after expiration of the primary term, the lessee drilled a second well which proved successful. The lessee contended that production from that second well kept the lease alive, but the court disagreed, stating that “the only unconditional right Skelly had under the lease, after the expiration of the primary term, was to complete the well it had commenced before such expiration.” 202 F.2d at 446.
The case of Sunac Petroleum Corp. v. Parkes, 416 S.W.2d 798 (Tex.1967), also involved a similar clause in a similar situation. In that case, the Texas Court of Civil Appeals had construed the clause to be a “continuous drilling operations clause” which extended the life of the lease during production from a second well. However, the Texas Supreme Court reversed, and held that this kind of clause did not permit a well drilled after expiration of the primary term to prolong the validity of the lease.
*1011 Likewise, the case of Rogers v. Osborn, 152 Tex. 540, 261 S.W.2d 311 (1953), involved a clause virtually identical to the one in the present case. The lessees argued that production from a second well, drilled after expiration of the primary term could be “tacked” to reworking of the first well in order to extend the lease. The court rejected that argument, and held as follows:
“Under the facts of this case the lessees cannot tack the period of the drilling of and production from Well No. 2 to the period of reworking Well No. 1. In order to do that the lessees would have to borrow the words ‘commences additional drilling' from the first sentence of paragraph 5 and transpose them to the second sentence. The conditions contained in the two separate sentences should not be jumbled. See note in Oil and Gas Reporter, Vol. 1, No. 2, p. 1592. The second use of the word ‘operations’ might be given the very broad construction used by the Court of Civil Appeals. This construction would allow a lessee to prolong a lease indefinitely and would take from the primary term much of its significance. The first two sentences apply to different factual situations. Since the first provides for ‘additional drilling’ and the second does not, we hold that the second word ‘operates’ as used in the second sentence does not include additional wells commenced after the expiration of the primary term. This sentence means that if production results from the continuous prosecution of the very operations being engaged in by the lessees upon the expiration of the primary term, the lease is good.”
Rogers, 152 Tex. at 546, 261 S.W.2d at 314-15.
We agree with the logic of the above cited treatises and cases, and hold that the drilling of, and production from, a second well drilled after the expiration of the primary term does not extend a lease under a “drilling operations clause.”
The defendants make an additional argument that, even if the drilling operations clause did not extend the validity of the lease, their tender of shut-in royalty payments to the plaintiffs kept the lease alive past the expiration of the primary term. The facts show that on January 9, 1980, less than one week before expiration of the primary term, the defendants sent the lessor 12 separate shut-in royalty checks, each representing ½ of the delay rental payment.[1] The defendants contend that these payments constitute “production” under the lease which would keep the lease alive pursuant to its habendum clause.
The clause in the lease on which this contention is based is paragraph three, which states as follows:
“3. ... [Wjhile there is a gas well on this lease or on acreage pooled therewith, but gas is not being sold or used, Lessee may pay as royalty at monthly intervals a sum equal to one-twelfth (½2) of the amount of the annual rental payable in lieu of drilling operations during the primary term on the number of acres subject to this lease at the time such payments is [sic] made, and if such payment is made or tendered, it will be considered that gas is being produced from this lease in paying quantities.”
This argument is erroneous, because the express terms of that clause show that it applies only during the primary term of the lease. The shut-in royalty payment provision in this case has no application beyond the primary term. Furthermore, the evidence in the record shows that the well in question was never “shut-in” or “capped” within the meaning of this clause; rather, the evidence shows that the easing supporting the well had collapsed and that the collapse had prohibited any further production.
*1012 Because of that difficulty, the well was plugged and abandoned. Of course, the normal reason for this clause to be exercised is the lack of a market for the gas being produced. Clearly, the tender of shut-in royalty payments will not keep a lease alive unless the well that was shut-in is capable of production in commercial quantities. Hoyt v. Continental Oil Co., 606 P.2d 560 (Okla.1980); Duke v. Sun Oil Co., 320 F.2d 853 (5th Cir.1963); Taylor v. Kimbell, 219 La. 731, 54 So.2d 1 (1951). See, Annot., 43 A.L.R.3d 8, 89-103 (1972); Annot., 96 A.L.R.2d 345, 353 (1964) (“The courts have held, even in the absence of an express provision in the lease to that effect, that in order to extend the lease beyond the primary term by the payment of shut-in royalty, a well must be capable of production ‘in paying quantities.’ ”). See also, Williams, Oil and Gas Terms 818-19; 3 Williams, Oil and Gas Law § 632.3, at 407 (1985); Walker, Clauses in Oil and Gas Leases Providing for the Payment of an Annual Sum as Royalty on a Nonproducing Gas Well, 24 Tex.L.Rev. 478 (1946). The gas well in this case was plainly not capable of production in commercial quantities.
In light of the above, we hold that the lease in question was not extended beyond the time when the first well was abandoned by the defendants. Consequently, we reverse the trial court’s judgment declaring the lease to be in full force and effect, and the cause is remanded.
REVERSED AND REMANDED.
MADDOX, ALMON, BEATTY and HOUSTON, JJ., concur.

. These 12 checks were received by the plaintiffs on January 10, 1980, but were returned uncashed to the defendants in January of 1981.