2003-NMSC-023

76 P.3d 626

**MARALEX RESOURCES, INC.,**
Plaintiff–Counter Defendant–
Respondent,

v.

Norman L. **GILBREATH**, Loretta E. Gil-
breath and Caprock Energy Company,
Inc., Defendants–Counter Plaintiffs–Pe-
titioners,

and

Norman L. Gilbreath, Loretta E. Gilbreath
and Caprock Energy Company, Inc.,
Third Party Plaintiffs–Petitioners,

v.

A.M. "Mickey" O'Hare, Third Party
Defendant–Respondent.

No. 27,366.

Supreme Court of New Mexico.

Aug. 19, 2003.

310

Tully & Jolley Law Offices, Richard T.C. Tully, Farmington, NM, for Petitioners.

Gallegos Law Firm, P.C., J.E. Gallegos, Michael J. Condon, Santa Fe, NM, for Respondents.

## OPINION

MAES, Chief Justice.

{1} This is an action to terminate an oil and gas lease in San Juan County, New Mexico. The lessee's gas well stopped producing between December 1990 and March 1991. The lessors asserted the lease had terminated for lack of production because the lessees failed to tender shut-in royalty payments during that time and failed to resume operations within 60 days after the well stopped producing. The district court agreed and concluded that the lease terminated. The Court of Appeals affirmed in a memorandum opinion. We also agree, though for different reasons, and we therefore affirm the judgment of the district court and the Court of Appeals.

## BACKGROUND

*Facts*

{2} The lease in question, signed in 1959, covers two sections of land in San Juan County: Section 24 of Township 30 North, Range 12 West and Section 19 of Township 30 North, Range 11 West. Petitioners, Norman and Loretta Gilbreath, are successors in interest to the original lessee. The lease contains a standard habendum clause, providing that "[t]his lease remains in force for a term of five years and as long thereafter as oil, gas, casinghead gas, or other mineral or any of them is or can be produced." During the five-year primary term, the original lessees successfully drilled one gas-producing well, Blancett Well # 1, in Section 24. Neither they nor the Gilbreaths drilled any other wells on the property. Blancett Well # 1 produced gas without interruption for several years until it stopped suddenly in December 1990. The Gilbreaths believed that production stopped because the pressure inside the well was insufficient to force the gas to flow into the pipeline operated by the gas purchaser, El Paso Natural Gas. In early January 1991, Norman Gilbreath closed off the valve to the pipeline in order to build up enough pressure in the well to overcome the pressure in the El Paso line. Because that step proved insufficient, on February 4, 1991, the Gilbreaths treated the well with foam to remove excess liquids, another step that can

increase pressure within the well. The well resumed production in March 1991.

{3} Around this same time, the Gilbreaths were negotiating to enter a farmout agreement with Plaintiff Maralex Resources, an oil and gas development company that was seeking to acquire new leaseholds in the San Juan County area. The farmout agreement would have allowed Maralex, rather than the Gilbreaths, to operate the well. While negotiating this agreement, Maralex hired a law firm to conduct a title search on the Gilbreaths' mineral interest. The firm issued a title opinion concluding that the lease terminated under the terms of the habendum clause because the well stopped producing between December 1990 and March 1991. The author of the title opinion concluded that, if the Gilbreaths wanted to prevent the lease from terminating during that period, they were required to make payments to the Blancetts under the terms of the "shut-in royalty clause," which in some situations allows the lessee to make predetermined payments instead of producing gas. Maralex provided this information to the Blancetts. In July 1991, the Gilbreaths mailed a royalty payment to the Blancetts. The royalty check represented payment for October 1989 to December 1990 the period prior to the time the well stopped producing. It is undisputed that the Blancetts were entitled to royalty payments for that time period. The Blancetts refused payment, asserting that the lease had already terminated because production ceased between December 1990 and March 1991.

{4} In October 1991, after asserting that the Gilbreaths' interest under the 1959 lease had terminated, the Blancetts executed two leases for Maralex covering the Section 24 lands. The Gilbreaths, however, through their development company Caprock Energy, retained rights to Section 19 under a separate lease, signed in January 1991, that gave them the right to build a new well within three years. The Gilbreaths did not build a new well, so the Caprock lease expired under its own terms in 1994. In May 1994, the Blancetts executed two additional leases for Maralex covering the Section 19 lands. Maralex then brought this suit seeking a declaratory judgment that (1) the 1959 lease expired under its own terms when the Gilbreaths failed to tender shut-in royalties in early 1991 and (2) the subsequent leases between Maralex and the Blancetts were therefore valid and in effect. The Gilbreaths brought numerous counterclaims alleging that Maralex interfered with their contractual relationship with the Blancetts.

*Proceedings*

{5} Maralex moved for partial summary judgment, asserting that the 1959 lease expired when production stopped during the early months of 1991. Maralex argued that, under the terms of the 1959 lease, if the Gilbreaths wanted to prevent the lease from terminating, they were required to pay shut-in royalties during the period of non-production. Because the Gilbreaths never tendered shut-in royalty payments, Maralex argued, the lease terminated under the terms of the habendum clause when the well stopped producing gas. The Gilbreaths raised several arguments in response. First, they argued that shut-in royalty payments were not required so long as they satisfied the "continuous operations clause" by taking steps to repair the well after it stopped producing. Second, while they argued that they could pay shut-in royalties to preserve the lease, they argued that the royalty payments were not yet due, so the lease had not yet terminated.[1] The district court rejected these arguments and granted Maralex's motion for summary judgment.

{6} The Gilbreaths filed two separate motions for reconsideration. In the second motion, they raised two new arguments, based on lease clauses that they claimed were previously illegible. First, they argued that the high pressure in the El Paso Natural Gas pipeline constituted an event beyond their control, and therefore they were protected by the force majeure clause, which prevents a lease from terminating when operations shut down due to a "cause beyond the control of the Lessee." They also argued that, be-

---

1. The Gilbreaths raised additional arguments before the district court, but those arguments have either been abandoned on appeal or are no longer relevant to our analysis.

cause there was a legitimate dispute as to when the shut-in royalties were due, they should be protected by the judicial ascertainment clause, which allows a lessee a reasonable time to comply with an implied covenant after a court has determined the lessee's obligations. The court held that neither the force majeure clause nor the judicial ascertainment clause were applicable. It also reaffirmed its ruling as to the shut-in royalty clause and the continuous operations clause. The court explained that, within 60 days after the well stopped producing, the Gilbreaths had the option of either (1) resuming operations or (2) tendering shut-in royalties. Because the Gilbreaths did neither, the district court held that the lease had expired under its own terms.

{7} Later, Maralex filed a full motion for summary judgment covering issues not raised in this appeal. Once that motion was granted, the Gilbreaths appealed to the Court of Appeals, which affirmed the judgment in an unpublished opinion. We granted certiorari.

## DISCUSSION

■ {8} This Court reviews a district court's decision to grant summary judgment de novo. *Mitchell–Carr v. McLendon*, 1999–NMSC–025, ¶ 30, 127 N.M. 282, 980 P.2d 65. Summary judgment is appropriate only where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Self v. United Parcel Serv.*, 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582. On appeal, this Court considers the facts in the light most favorable to support a trial on the issues, because summary judgment is improper if a triable issue of fact exists. *Madsen v. Scott*, 1999–NMSC–042, ¶ 7, 128 N.M. 255, 992 P.2d 268.

■ {9} The typical oil and gas lease grants the lessee a fee simple determinable interest in the subsurface minerals within a designated area. *See Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002). It is the habendum clause of the lease that establishes the duration of the estate. *Id.* The typical habendum clause designates a primary term, during which the lessee must successfully drill a producing well, and then provides that the lease remains in effect so

long as oil or gas is produced from the land. To satisfy the habendum clause production must be in "paying quantities," such that the income generated from oil and gas production exceeds the operating costs. *See Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684, 689 (1959); *cf. Greer v. Salmon*, 82 N.M. 245, 246, 479 P.2d 294, 295 (1970) (describing well as capable of producing in "commercial quantities"); *Town of Tome Land Grant, Inc. v. Ringle Dev. Co.*, 56 N.M. 101, 104–05, 240 P.2d 850, 852–53 (1952) (discussing rule that production may be in paying quantities). Under most leases, if the lessee fails to produce oil or gas in paying quantities before the end of the primary term, or if production ceases after the primary term, the lease will automatically terminate. *See Greer*, 82 N.M. at 248, 479 P.2d at 297.

■ {10} Most leases, however, contain savings clauses, which allow the lessee to avoid the consequences of automatic lease termination when production ceases. *See id.* at 247, 479 P.2d at 296. The issue in this case is whether the 1959 lease terminated when gas production ceased between December 1990 and March 1991, or whether the Gilbreaths were able to maintain the lease through one of its savings clauses. "Generally, the lessor has the burden of proving the . . . cancellation of a mineral lease." *Webb v. Hardage Corp.*, 471 So.2d 889, 892 (La.Ct. App.1985). The Gilbreaths argue that the district court erred in concluding that the 1959 lease had terminated because there are material questions of fact as to whether they satisfied the terms of two separate savings clauses: the shut-in royalty and continuous operations clauses. They also argue that the lease did not terminate under the terms of the force majeure clause because the cessation of production was beyond their control. We address each argument in turn.

### The Shut-in Royalty Clause

■ {11} Section 4 of the 1959 lease provides that:

[W]here gas from a well or wells capable of producing gas only is not sold or used, lessee may pay annually as royalty an amount equal to the delay rentals as pro-

vided in Section 5 hereof, which payment shall not be less than $100.00 per well per year, and if such payment is made it will be considered that gas is being produced from the above described land under all terms and clauses hereof.

This clause, known as the shut-in royalty clause, applies to the production of gas, rather than oil. *See Greer*, 82 N.M. at 248–49, 479 P.2d at 297–98. Such a clause is necessary because gas, unlike oil, cannot be stored for future sale. *Id.* at 249, 479 P.2d at 297; *see also Pray v. Premier Petroleum, Inc.*, 233 Kan. 351, 662 P.2d 255, 257 (1983). Instead, gas must be transported by pipeline. *See Pray*, 662 P.2d at 257. The shut-in royalty clause was generally intended to cover situations where the lessee decides to stop production because the price of gas is too low. *See* 4 Eugene Kuntz, *A Treatise on the Law of Oil and Gas*, § 46.4(c) (1989). When no market is available for gas, "strict application of the habendum clause would terminate the lease for lack of production." *Pray*, 662 P.2d at 257. The shut-in royalty clause allows the lessee to keep a non-producing lease in force by paying a predetermined amount as a substitute for royalty payments from production. *See id.* The clause allows the lessee to hold the lease while waiting for the market to improve, but insures that the lessor continues to receive some benefit from the lease. *See* 4 Kuntz, § 46.4(c).

{12} Maralex initially argued that the lease terminated because the Gilbreaths failed to pay shut-in royalties during the period of non-production in order to prevent the lease from terminating. In arguments before the district court and the Court of Appeals, the parties assumed that, after the well stopped producing in December 1990, the Gilbreaths could have invoked the shut-in royalty clause contained in the 1959 lease. The dispute among the parties focused on whether the payments were due before or after the Blancetts asserted that the lease had terminated. The district court concluded that the lease terminated because the Gilbreaths failed to make a timely tender of shut-in royalty payments.

{13} After we granted certiorari, we asked the parties to provide supplemental briefing addressing whether or not the Gilbreaths had the option of paying shut-in royalties in order to prevent the lease from terminating. In response, Maralex argued, for the first time, that the shut-in royalty clause does not apply when a well is incapable of producing gas in paying quantities, and therefore even if the Gilbreaths had tendered shut-in royalty payments, the lease would have terminated. Maralex relies on the particular language of the shut-in royalty clause within the 1959 lease, as well as cases from other jurisdictions that have so limited the application of the shut-in royalty clause. *See, e.g., Hydrocarbon Mgmt., Inc. v. Tracker Exploration*, 861 S.W.2d 427, 432–33 (Tex. App.1993). We now consider those arguments, although they were not raised before the district court or the Court of Appeals, because an appellate court "will affirm the district court if it is right for any reason and if affirmance is not unfair to the appellant." *Moffat v. Branch*, 2002–NMCA–067, ¶ 13, 132 N.M. 412, 49 P.3d 673.

{14} Hydrocarbon also involved a well that suddenly stopped producing gas. *See Hydrocarbon*, 861 S.W.2d at 431. The lessees shut down the well for a 24–hour period in an attempt to build up pressure within the well. *Id.* When the lessees tried to turn the well back on, gas would not flow. *Id.* The Texas court held that the lessees could not invoke the shut-in royalty clause to save the lease from termination. *Id.* at 432. The court held that "for a well to be maintained by the payment of shut-in royalties, it must be *capable of* producing gas in paying quantities." *Id.* at 432–33. The court then explained that a well is capable of production when it can produce gas "without the need of further mechanical work" and added the following description:

> We believe that the phrase "capable of production in paying quantities" means a well that will produce in paying quantities if the well is turned "on," and it begins flowing, without additional equipment or repair. Conversely, a well would not be capable of producing in paying quantities if the well switch were turned "on," and the well did not flow, because of mechanical

problems or because the well needs rods, or pumping equipment. *Id.* at 433–34. Recently, in a case that did not involve a shut-in royalty clause, the Texas Supreme Court affirmed this definition of "capable of production." *See Anadarko Petroleum,* 94 S.W.3d at 558.

{15} The *Hydrocarbon* court then held that the well in that case was incapable of producing in paying quantities, because it did not flow when turned on. *Hydrocarbon,* 861 S.W.2d at 434. As a result, the court held that the lessees could not save the lease through payments of shut-in royalties. *Id.* at 435. Other jurisdictions have reached the same conclusion. *See Griffin v. Crutcher-Tufts Corp.,* 500 So.2d 1008, 1011–12 (Ala. 1986) ("[T]he tender of shut-in royalty payments will not keep a lease alive unless the well that was shut-in is capable of production in commercial quantities."); *Pray,* 662 P.2d at 258 ("[A]lthough the shut-in royalty clause does not normally specify that the shut-in well must be capable of producing in paying quantities, such a requirement is implied."); *Taylor v. Kimbell,* 219 La. 731, 54 So.2d 1, 3 (1951) (holding that lease had terminated and the lessors had rightly refused shut-in royalty payments because "it does not appear to us that the well is capable of producing in paying quantities"); *Bixler v. Lamar Expl. Co.,* 733 P.2d 410, 412 (Okla.1987) ("It is generally said that payment of a shut-in royalty will not suffice to hold a lease unless the shut-in well is capable of paying production.").

{16} The Gilbreaths acknowledge that the jurisdictions cited above have limited the application of the shut-in royalty clause. They argue, however, that New Mexico adopted a different approach in *Greer,* 82 N.M. at 250, 479 P.2d at 299. In *Greer,* a gas well stopped producing due to a leak in the line. *Id.* at 246, 479 P.2d at 295. No gas was produced for almost four years. *Id.* During that time, the lessees did not attempt to

either fix the leak in the line or drill a new well. *Id.* In addition, the lessees did not pay shut-in royalties during that time. *Id.* The lessees acknowledged that they failed to comply with the terms of any savings clause. Nonetheless, they relied on relatively uncommon language within the lease's habendum clause, providing that the lease would remain in effect so long as gas "is produced or producible." *Id.* Based on this language, the lessees in *Greer* argued that their lease remained in effect so long as their well was capable of producing gas, even if there was no actual production. *Id.* at 247, 479 P.2d at 296. As a result, they argued that they were not required to satisfy the terms of the savings clauses within the lease in order to prevent the lease from terminating. *Id.*

{17} The *Greer* Court disagreed, holding that, despite the particular language within the lease, the lease would terminate under the habendum clause unless the lessees complied with the terms of a savings clause.[2] *Id.* at 248–49, 479 P.2d at 297–98. The Court arrived at that conclusion by analyzing the savings clauses within the lease. First, the Court examined a clause that is commonly referred to as a "cessation of production clause." The clause in *Greer* specified that in the event production should cease, the lessee had "the right at any time within ninety (90) days from the cessation of such production to resume drilling operations in an effort to obtain further production...." *Id.* at 247, 479 P.2d at 296. The Court observed that the clause was "designed to relieve the lessee from some of the harsh consequences of automatic termination." *Id.* The Court also observed that the clause gave the lessees the right to continue drilling, but imposed no duty upon the lessees to do so. *Id.* The Court concluded that the lease would terminate under the habendum clause unless the lessee satisfied the terms of a savings clause, such as the cessation of production clause. *Id.* at 248, 479 P.2d at 297.

---

**2.** Interestingly, the habendum clause in the 1959 lease is similar to the one in *Greer,* in that it provides that the lease remains in effect so long as gas "is or can be produced." Recently, the Texas Supreme Court disagreed with *Greer,* reading identical language to mean that actual production is not required to sustain the lease. *See*

*Anadarko Petroleum,* 94 S.W.3d at 555–56. Neither party in this case has asked us to revisit *Greer's* holding that actual production is required. Any such argument would be irrelevant, because, as discussed below, in this case it was clear that the well was not capable of production.

{18} The *Greer* Court went on to conduct a similar analysis of the shut-in royalty clause, which in that lease provided that the lessees could pay a set amount while gas was "not . . . sold or used." *Id.* at 249, 479 P.2d at 298. The Court explained that the clause was also designed to save a lessee from automatic termination by providing "a reasonable alternative to a lessee who is not able to produce gas, that is, market and pay the 1/8th royalty. It is a provision for substitute production or constructive production to arrive at a status of production as distinguished from actual production." *Id.* The Court observed that there would be no need to include a shut-in royalty clause unless the lease would terminate under the terms of the habendum clause if the lessee failed to produce gas. *Id.*

{19} In concluding this analysis, the *Greer* Court stated that "[t]he appellants could have saved themselves from automatic termination by complying with [the cessation of production clause]. Not having done this, they could have saved themselves from automatic termination by paying the shut-in royalty for the producible well, but this was not done." *Id.* at 250, 479 P.2d at 299. Based on this language, the Gilbreaths argue that New Mexico does not limit the application of the shut-in royalty clause to wells that are capable of producing in paying quantities. The Gilbreaths note that the well in *Greer* stopped producing due to problems with the gas line. The Gilbreaths argue that *Greer,* unlike the cases cited above, gives a lessee the option of either working to fix the well or paying shut-in royalties in order to prevent a lease from terminating when a well is incapable of production.

{20} We do not believe that *Greer* stands for the proposition that a lessee can preserve a lease by paying shut-in royalties when a well is incapable of production. Instead, we believe the issue is undecided in New Mexico. We recognize that the well in *Greer* would not appear to meet the standard set out in *Hydrocarbon* and *Anadarko Petroleum.* It would appear that, because there was a leak in the line, the well would not have produced gas if the lessees had turned it on. Nonetheless, the parties stipulated that "the well was capable of producing in commercial quantities." *Greer,* 82 N.M. at 246, 479 P.2d at 295. The Court also observed that "[a]t all times, the Pictured Cliff well was 'producible,' that is capable of producing in commercial quantities." *Id.* at 246–47, 479 P.2d at 295–96. Thus, in *Greer* the lessee sought to apply the shut-in royalty clause to a well that was capable of producing in paying quantities.

{21} Moreover, in *Greer,* the lessees argued that they did not have to satisfy the terms of any savings clause, and it was clear in that case that the lessees had not satisfied the terms of any savings clause. The issue to be decided in *Greer* was the meaning of the habendum clause within that lease. The Court analyzed the shut-in royalty clause in order to determine the meaning of the habendum clause. The Court did not address the question of whether the shut-in royalty clause applied when a well is incapable of production because neither party raised that argument. Because cases are not authority for propositions not considered, *see Fernandez v. Farmers Ins. Co.,* 115 N.M. 622, 627, 857 P.2d 22, 27 (1993), *Greer* does not stand for the proposition that a lessee experiencing mechanical difficulties has the right to maintain a lease by paying shut-in royalties.

{22} In addition, while some general rules govern the interpretation of oil and gas leases, "a lessor and a lessee frequently vary from standardized oil and gas lease forms, which makes hazardous the application of standardized interpretations." *Greer,* 82 N.M. at 247, 479 P.2d at 296. In this case, the 1959 lease allows the lessees to tender shut-in royalty payments when "gas from a well or wells *capable of producing gas only* is not sold or used." We think this clause puts two limits on the application of the shut-in royalty clause in this case. First, it limits the application of the clause to wells that produce gas, rather than oil. Second, we believe it limits the application of the clause to wells that are capable of production. Thus, the specific language of this lease is consistent with the general rule from *Hydrocarbon* and other cases. In contrast, the shut-in royalty clause in *Greer* excluded the phrase "capable of production." That clause allowed the lessee to tender shut-in royalty

payments when gas was "not ... sold or used." We express no opinion, however, as to whether such language should be interpreted to allow a broader application of the shut-in royalty clause than we have applied in this case. As noted above, that question was not before the *Greer* Court, and it is not before us today. In each case, the specific language of the lease must be examined to determine the intent of the parties. Because we believe the specific language of the shut-in royalty clause within the 1959 lease requires the well in this case to be capable of production, we need not decide in this case whether to adopt a more general rule limiting the application of the shut-in royalty clause to wells that are capable of producing gas.

█ {23} As noted above, the burden generally falls on the party seeking to terminate a mineral lease to prove that there was no production and that the lessees failed to satisfy the terms of any savings clause. Nonetheless, once a party has established that there was no production from a well, some jurisdictions shift the burden to the lessee to prove that a well is capable of producing in paying quantities. *See Webb*, 471 So.2d at 892 ("A lessee cannot place the burden of proving the propriety of cancellation on the lessor by simply alleging that a well ... is capable of producing in paying quantities. Rather, the lessee must prove by a preponderance of evidence ... that the well was ... demonstratively capable of producing in paying quantities."). We need not decide where the burden lies, because in this case there was no question that Blancett Well # 1 was incapable of producing gas from December 1990 through February 1991. The Gilbreaths acknowledged that fact in their briefs to the district court and the Court of Appeals, and have not claimed that their well was capable of production during that time period.

{24} Despite these concessions, the Gilbreaths argue that we must remand this cause so that the district court can determine whether the well was capable of production. They base their arguments on *Clifton v, Koontz*. In that case, the well in question operated at a loss for a period of two to three

months. *Clifton*, 325 S.W.2d at 689. The lessors argued that the lease terminated because the well was not producing in paying quantities during that time period. *Id.* Rather than consider the period of time suggested by the lessors, the district court looked at the profit from the well over a one-year time period and determined that the well did produce in paying quantities. *Id.* The Gilbreaths argue that we must remand this case so that the district court can consider the appropriate time period to determine whether there was production in paying quantities from Blancett Well # 1.

█ {25} *Clifton* has no application to this case. Indeed, the *Clifton* court specified that its holding did not extend to cases in which a well stopped producing altogether. *Id.* at 690. The Court explained that specific clauses, such as a cessation of production or continuous operations clause, apply when a well stops producing. *Id.* Those clauses often designate a specific time period, such as 60 or 90 days, during which the lessee must take steps toward resuming production. Thus, when production stops as a result of a mechanical problem with the well, the lessee must satisfy the terms of the cessation of production clause in order to prevent the lease from terminating. In this case, it is undisputed that Blancett Well # 1 stopped producing in December 1990 due to a problem with the well. Therefore, the *Clifton* analysis does not apply. In addition, the Gilbreaths never raised this argument below, although such an argument directly related to Maralex's claim that the 1959 lease terminated due to lack of production.

{26} We see no reason to remand this issue to the district court, even though the district court did not consider arguments regarding the applicability of the shut-in royalty clause. We have held that the Gilbreaths could only rely on the shut-in royalty clause if the well in this case were capable of production. There is no evidence in the record to support a claim that the well was capable of production. For that reason, we do not believe it would be unfair to the Gilbreaths to affirm the district court, even though we do so on different grounds. In addition, we need not address the parties' arguments

about the due date of the shut-in royalty payments or the interpretation of the judicial ascertainment clause. Because the Gilbreaths could not rely on the shut-in royalty clause, they could only save the lease by complying with the terms of another savings clause. We next consider whether they complied with the continuous operations clause within the 1959 lease.

### The Continuous Operations Clause

{27} The Gilbreaths assert that the 1959 lease did not terminate because they complied with the terms of the continuous operations clause,[3] which provides that

> If, at the expiration of the primary term, Lessee is conducting operations for drilling a new well on said land or on acreage pooled therewith or reworking an old well thereon, or, if, after the expiration of the primary term, production on this lease or on acreage pooled therewith shall cease, this lease nevertheless shall continue as long as said operations continue or additional operations are had on this lease or on acreage pooled therewith, which additional operations shall be deemed to be had where not more than sixty (60) days elapsed between abandonment or operation on one well and commencement of operations on another well, . . . .

They argue that the district court erred by concluding that they were required to begin reworking operations within 60 days. The plain language of the clause, they argue, only requires that there be no more than 60 days between the abandonment of one well and efforts to begin drilling a new well. They observe that the plain language imports no similar time limit for the commencement of reworking operations. As a result, they argue that the lease should not terminate so long as they exercised due diligence in working to regain production. In the alternative, they argue that they satisfied the 60–day time limit by closing the valve to the well in early January 1991. They argue that this action can be considered reworking opera-

tions because it was the first step in the efforts to resume well production.

{28} We see nothing in the record to indicate that the Gilbreaths preserved either of these arguments for appeal. "To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked." *Woolwine v. Furr's, Inc.*, 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App.1987); Rule 12–216(A) NMRA 2003. The Gilbreaths assert that they preserved the first argument-that shutting in the well constituted reworking operations-through the affidavit submitted by Norman Gilbreath, which was attached to their response to Maralex's Motion for Summary Judgment. In the affidavit, Mr. Gilbreath explained that he closed off the valve to the well in order to rebuild pressure within the well. In their brief submitted to the district court, however, the Gilbreaths never argued that this act constituted reworking operations. Instead, they argued that they had 60 days from the day Mr. Gilbreath shut in the well to begin reworking operations. The district court rejected that argument, and the Gilbreaths have abandoned it on appeal. The affidavit was insufficient to preserve the argument they now raise on appeal.

{29} The Gilbreaths make no effort to assert that they raised their other argument on appeal-that there was no 60–day time limit for reworking operations-in arguments before the district court. Instead, they ask this court to "construe the rules of appellate procedure liberally so that causes on appeal can be determined on their merits." We decline to do so. After the district court granted summary judgment in favor of Maralex, the Gilbreaths filed two separate motions to reconsider. In total, the Gilbreaths filed three separate briefs addressing the interpretation of the lease. Having failed to raise this issue in any of those briefs submitted to the district court, they cannot raise the issue on appeal.

---

**3.** Throughout the proceedings, the parties to this case have described this clause as the continuous operations clause. They did so, in part, to distinguish it from a different clause, which they labeled the cessation of production clause, that applied during the primary term of the lease. Nonetheless, that this clause is similar in effect to the "cessation of production clause" in *Greer* and other cases.

318

{30} The Gilbreaths also argue that they preserved these arguments by raising them in a docketing statement submitted to the Court of Appeals, which was filed after the district court first entered partial summary judgment in favor of Maralex. The Court of Appeals refused to hear the appeal at that time because no final order had been issued. Our rules on preservation, however, require a party to invoke a ruling by the district court. Rule 12–216(A). The district court was not required to respond to arguments raised before the Court of Appeals. Because the Gilbreaths failed to preserve these arguments regarding the continuous operations clause, we will not consider them on appeal.

*Force Majeure*

{31} The Gilbreaths argue that the lease did not terminate because the problem with line pressure was beyond their control and therefore triggered the force majeure clause, which applies when production ceases due to events beyond the control of the well operators. *See Sun Operating Ltd. P'ship v. Holt,* 984 S.W.2d 277, 282 (Tex.App. 1998). New Mexico has no cases interpreting a force majeure clause. What types of events constitute force majeure depends on the specific language included in the clause. *Id.* at 283. In this case, the force majeure clause provides that:

> All express or implied covenants of this lease shall be subject to all Federal and State laws, Executive Orders, Rules or Regulations, and this lease shall not be terminated, in whole or in part, nor lessee held liable in damages, for failure to comply therewith, if compliance is prevented by, or if such failure is the result of any such Law, Order, Rule or Regulations or if prevented by an act of God, of the public enemy, labor disputes, inability to obtain material, failure of transportation, or other cause beyond the control of the Lessee.

The Gilbreaths argue that the line pressure problem either constituted a "failure of transportation" or fit into the catch-all phrase "other cause beyond the control of the Lessee."

{32} In response, Maralex argues that the force majeure clause does not apply because it was within the Gilbreaths' control to make shut-in royalty payments. This argument misconstrues the purpose of the force majeure clause. If the cessation of production is caused by a force majeure event, then no shut-in royalties are due. *Sun Operating,* 984 S.W.2d at 288–89. When production stops because of an event beyond the control of the lessee, both parties bear the burden of the loss of royalties from nonproduction. *See id.* In contrast, when the lessee shuts down operations for market reasons, the shut-in royalty clause applies and the lessee must compensate the lessor for the lost production.

{33} The question to be decided, then, is whether the cessation of production was the result of a cause beyond the control of the Gilbreaths. " '[W]here general words follow an enumeration of persons or things of a particular and specific meaning, the general words are not construed in their widest extent but are instead construed as applying to persons or things of the same kind or class as those specifically mentioned.' " *State v. Foulenfont,* 119 N.M. 788, 791, 895 P.2d 1329, 1332 (Ct.App.1995) (quoting *State v. Bybee,* 109 N.M. 44, 46, 781 P.2d 316, 318 (Ct.App. 1989)). In applying this doctrine, we look to the specific terms employed and seek the common characteristics among them, excluding anything that does not share those characteristics. *See Hartman v. Texaco,* 1997–NMCA–032, ¶ 10, 123 N.M. 220, 937 P.2d 979; *see also United Nuclear Corp. v. Allendale Mut. Ins. Co.,* 103 N.M. 480, 484, 709 P.2d 649, 653 (1985) (applying doctrine of ejusdem generis when interpreting terms of a contract). In the 1959 lease, the force majeure clause lists various forces that can cause a cessation of production. None of these forces involve the internal mechanical operations of the well itself. Instead, the list describes external forces beyond the control of a lessee, such as natural disasters or governmental decisions.

{34} The Gilbreaths contend that the cessation of production was beyond their control because it was caused by the pressure within the El Paso Natural Gas line.

Specifically, they assert that production ceased because "the pressure in the pipeline of the purchaser of gas from the Blancett Well # 1 was so high that the Well did not have sufficient gas volumes and pressures to be able to produce against such high line pressure." A claim of force majeure is equivalent to an affirmative defense, and therefore the burden is on the lessee to prove that the events were beyond their control. *See Sun Operating*, 984 S.W.2d at 282. Because it was undisputed that there was no production between December 1990 and March 1991, the burden was on the Gilbreaths to come forward with any evidence tending to show that the cessation of production was beyond their control or was caused by a failure of transportation. We agree that the cessation of production could be considered beyond the control of the Gilbreaths if it was caused by a problem with the El Paso pipeline. In contrast, we do not believe the force majeure clause applies if the cessation of production was caused by insufficient pressure within the well, as this would not be an external cause beyond their control. The Gilbreaths, however, failed to present any evidence establishing that the cessation of production was caused by abnormally high line pressure within the El Paso line, rather than too little pressure within Blancett Well # 1. Instead, the Gilbreaths conceded that well operators often need to build up pressure within a well in order to force gas to flow against pressure within the purchaser's line. Therefore, the district court properly granted summary judgment in favor of Maralex on this issue.

*Counterclaims*

{35} In addition to granting summary judgment in favor of Maralex on the question of whether the 1959 lease was still valid, the district court also dismissed all the counterclaims brought by the Gilbreaths. These included claims for tortious interference with contract, breach of the covenant of good faith and fair dealing, misrepresentation, fraud, slander of title, and prima facie tort. The parties agree that if the 1959 lease is invalid, then the district court properly dismissed these counterclaims. We have held that neither the shut-in royalty clause nor the force majeure clauses apply, and that the Gilbreaths failed to preserve the argument that they complied with the terms of the continuous operations clause. Therefore, the 1959 lease terminated during the spring of 1991, and the district court properly dismissed the Gilbreaths' counterclaims.

## CONCLUSION

{36} The 1959 lease terminated when production ceased during the spring of 1991. Because neither the shut-in royalty clause nor the force majeure clauses apply, and because the Gilbreaths failed to preserve the argument that they complied with the terms of the continuous operations clause, the district court properly entered summary judgment in favor of Maralex. The judgment of the district court is affirmed.

{37} **IT IS SO ORDERED.**

WE CONCUR: PAMELA B. MINZNER, Justice, PATRICIO M. SERNA, Justice, and RICHARD C. BOSSON, Justice.